## HALEY *v.* OHIO.

No. 51.   Argued November 17, 1947.—Decided January 12, 1948.

*Edgar W. Jones* argued the cause for petitioner.   With him on the brief was *E. L. Mills.   D. Bruce Mansfield* was also of counsel.

*D. Deane McLaughlin* and *W. Bernard Rodgers* argued the cause for respondent.   With them on the brief was *John Rossetti.*

Mr. Justice Douglas announced the judgment of the Court and an opinion in which Mr. Justice Black, Mr. Justice Murphy, and Mr. Justice Rutledge join.

Petitioner was convicted in an Ohio court of murder in the first degree and sentenced to life imprisonment. The Court of Appeals of Ohio sustained the judgment of conviction over the objection that the admission of petitioner's confession at the trial violated the Fourteenth Amendment of the Constitution. 79 Ohio App. 237. The Ohio Supreme Court, being of the view that no debatable constitutional question was presented, dismissed the appeal. 147 Ohio St. 340. The case is here on a petition for a writ of certiorari which we granted because we had doubts whether the ruling of the court below could be squared with *Chambers* v. *Florida,* 309 U. S. 227, *Malinski* v. *New York,* 324 U. S. 401, and like cases in this Court.

A confectionery store was robbed near midnight on October 14, 1945, and William Karam, its owner, was shot. It was the prosecutor's theory, supported by some evidence which it is unnecessary for us to relate, that petitioner, a Negro boy aged 15, and two others, Willie Lowder, aged 16, and Al Parks, aged 17, committed the crime, petitioner acting as a lookout. Five days later—around midnight October 19, 1945—petitioner was arrested at his home and taken to police headquarters.

There is some contrariety in the testimony as to what then transpired. There is evidence that he was beaten. He took the stand and so testified. His mother testified that the clothes he wore when arrested, which were exchanged two days later for clean ones she brought to the jail, were torn and blood-stained. She also testified that when she first saw him five days after his arrest he was bruised and skinned. The police testified to the contrary on this entire line of testimony. So we put to one side the

controverted evidence. Taking only the undisputed testimony (*Malinski* v. *New York, supra,* p. 404 and cases cited), we have the following sequence of events. Beginning shortly after midnight this 15-year-old lad was questioned by the police for about five hours. Five or six of the police questioned him in relays of one or two each. During this time no friend or counsel of the boy was present. Around 5 a. m.—after being shown alleged confessions of Lowder and Parks—the boy confessed. A confession was typed in question and answer form by the police. At no time was this boy advised of his right to counsel; but the written confession started off with the following statement:

> "we want to inform you of your constitutional rights, the law gives you the right to make this statement or not as you see fit. It is made with the understanding that it may be used at a trial in court either for or against you or anyone else involved in this crime with you, of your own free will and accord, you are under no force or duress or compulsion and no promises are being made to you at this time whatsoever.
>
> "Do you still desire to make this statement and tell the truth after having had the above clause read to you?
>
> "A. Yes."

He was put in jail about 6 or 6:30 a. m. on Saturday, the 20th, shortly after the confession was signed. Between then and Tuesday, the 23d, he was held incommunicado. A lawyer retained by his mother tried to see him twice but was refused admission by the police. His mother was not allowed to see him until Thursday, the 25th. But a newspaper photographer was allowed to see him and take his picture in the early morning hours of the 20th, right after he had confessed. He was not taken before a magistrate and formally charged with a crime

until the 23d—three days after the confession was signed.

The trial court, after a preliminary hearing on the voluntary character of the confession, allowed it to be admitted in evidence over petitioner's objection that it violated his rights under the Fourteenth Amendment. The court instructed the jury to disregard the confession if it found that he did not make the confession voluntarily and of his free will.

But the ruling of the trial court and the finding of the jury on the voluntary character of the confession do not foreclose the independent examination which it is our duty to make here. *Ashcraft* v. *Tennessee,* 322 U. S. 143, 147–148. If the undisputed evidence suggests that force or coercion was used to exact the confession, we will not permit the judgment of conviction to stand, even though without the confession there might have been sufficient evidence for submission to the jury. *Malinski* v. *New York, supra,* p. 404, and cases cited.

We do not think the methods used in obtaining this confession can be squared with that due process of law which the Fourteenth Amendment commands.

What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a. m. But we cannot believe that a lad of tender years is

a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him. No friend stood at the side of this 15-year-old boy as the police, working in relays, questioned him hour after hour, from midnight until dawn. No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning. A photographer was admitted once this lad broke and confessed. But not even a gesture towards getting a lawyer for him was ever made.

This disregard of the standards of decency is underlined by the fact that he was kept incommunicado for over three days during which the lawyer retained to represent him twice tried to see him and twice was refused admission. A photographer was admitted at once; but his closest friend—his mother—was not allowed to see him for over five days after his arrest. It is said that these events are not germane to the present problem because they happened after the confession was made. But they show such a callous attitude of the police towards the safeguards which respect for ordinary standards of human relationships compels that we take with a grain of salt their present apologia that the five-hour grilling of this boy was conducted in a fair and dispassionate manner. When the police are so unmindful of these basic standards of conduct in their public dealings, their secret treatment of a 15-year-old boy behind closed doors in the dead of night becomes darkly suspicious.

The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of

the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law.

But we are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain.

The course we followed in *Chambers* v. *Florida, supra, White* v. *Texas,* 310 U. S. 530, *Ashcraft* v. *Tennessee, supra,* and *Malinski* v. *New York, supra,* must be followed here. The Fourteenth Amendment prohibits the police from using the private, secret custody of either man or child as a device for wringing confessions from them.

*Reversed.*

MR. JUSTICE FRANKFURTER, joining in reversal of judgment.

In a recent series of cases, beginning with *Brown* v. *Mississippi,* 297 U. S. 278, the Court has set aside convictions coming here from State courts because they were based on confessions admitted under circumstances that offended the requirements of the "due process" exacted

from the States by the Fourteenth Amendment. If the rationale of those cases ruled this, we would dispose of it *per curiam* with the mere citation of the cases. They do not rule it. Since at best this Court's reversal of a State court's conviction for want of due process always involves a delicate exercise of power and since there is a sharp division as to the propriety of its exercise in this case, I deem it appropriate to state as explicitly as possible why, although I have doubts and difficulties, I cannot support affirmance of the conviction.

The doubts and difficulties derive from the very nature of the problem before us. They arise frequently when this Court is obliged to give definiteness to "the vague contours" of Due Process or, to change the figure, to spin judgment upon State action out of that gossamer concept. Subtle and even elusive as its criteria are, we cannot escape that duty of judicial review. The nature of the duty, however, makes it especially important to be humble in exercising it. Humility in this context means an alert self-scrutiny so as to avoid infusing into the vagueness of a Constitutional command one's merely private notions. Like other mortals, judges, though unaware, may be in the grip of prepossessions. The only way to relax such a grip, the only way to avoid finding in the Constitution the personal bias one has placed in it, is to explore the influences that have shaped one's unanalyzed views in order to lay bare prepossessions.

A lifetime's preoccupation with criminal justice, as prosecutor, defender of civil liberties, and scientific student, naturally leaves one with views. Thus, I disbelieve in capital punishment. But as a judge I could not impose the views of the very few States who through bitter experience have abolished capital punishment upon all the other States, by finding that "due process" proscribes it. Again, I do not believe that even capital offenses by boys of fifteen should be dealt with according

to the conventional criminal procedure. It would, however, be bald judicial usurpation to hold that States violate the Constitution in subjecting minors like Haley to such a procedure. If a State, consistently with the Fourteenth Amendment, may try a boy of fifteen charged with murder by the ordinary criminal procedure, I cannot say that such a youth is never capable of that free choice of action which, in the eyes of the law, makes a confession "voluntary." Again, it would hardly be a justifiable exercise of judicial power to dispose of this case by finding in the Due Process Clause Constitutional outlawry of the admissibility of all private statements made by an accused to a police officer, however much legislation to that effect might seem to me wise. See The Indian Evidence Act of 1872, § 25; cf. § 26.

But whether a confession of a lad of fifteen is "voluntary" and as such admissible, or "coerced" and thus wanting in due process, is not a matter of mathematical determination. Essentially it invites psychological judgment—a psychological judgment that reflects deep, even if inarticulate, feelings of our society. Judges must divine that feeling as best they can from all the relevant evidence and light which they can bring to bear for a confident judgment of such an issue, and with every endeavor to detach themselves from their merely private views. (It is noteworthy that while American experience has been drawn upon in the framing of constitutions for other democratic countries, the Due Process Clause has not been copied. See, also, the illuminating debate on the proposal to amend the Irish Home Rule Bill by incorporating our Due Process Clause. 42 H. C. Deb. 2082–2091, 2215–2267 (5th ser., Oct. 22, 23, 1912).)

While the issue thus formulated appears vague and impalpable, it cannot be too often repeated that the limitations which the Due Process Clause of the Fourteenth Amendment placed upon the methods by which the States

may prosecute for crime cannot be more narrowly conceived. This Court must give the freest possible scope to States in the choice of their methods of criminal procedure. But these procedures cannot include methods that may fairly be deemed to be in conflict with deeply rooted feelings of the community. See concurring opinions in *Malinski* v. *New York,* 324 U. S. 401, 412, and *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 466. Of course this is a most difficult test to apply, but apply it we must, warily, and from case to case.

This brings me to the precise issue on the record before us. Suspecting a fifteen-year-old boy of complicity in murder resulting from attempted robbery, at about midnight the police took him from his home to police headquarters. There he was questioned for about five hours by at least five police officers who interrogated in relays of two or more. About five o'clock in the morning this procedure culminated in what the police regarded as a confession, whereupon it was formally reduced to writing. During the course of the interrogation the boy was not advised that he was not obliged to talk, that it was his right if he chose to say not a word, nor that he was entitled to have the benefit of counsel or the help of his family. Bearing upon the safeguards of these rights, the Chief of Police admitted that while he knew that the boy "had a right to remain mute and not answer any questions" he did not know that it was the duty of the police to apprise him of that fact. Unquestionably, during this whole period he was held incommunicado. Only after the night-long questioning had resulted in disclosures satisfactory to the police and as such to be documented, was there read to the boy a clause giving the conventional formula about his constitutional right to make or withhold a statement and stating that if he makes it, he makes it of his "own free will." Do these uncontested facts justify a State court in

finding that the boy's confession was "voluntary," or do the circumstances by their very nature preclude a finding that a deliberate and responsible choice was exercised by the boy in the confession that came at the end of five hours questioning?

The answer, as has already been intimated, depends on an evaluation of psychological factors, or, more accurately stated, upon the pervasive feeling of society regarding such psychological factors. Unfortunately, we cannot draw upon any formulated expression of the existence of such feeling. Nor are there available experts on such matters to guide the judicial judgment. Our Constitutional system makes it the Court's duty to interpret those feelings of society to which the Due Process Clause gives legal protection. Because of their inherent vagueness the tests by which we are to be guided are most unsatisfactory, but such as they are we must apply them.

The Ohio courts have in effect denied that the very nature of the circumstances of the boy's confession precludes a finding that it was voluntary. Their denial carries great weight, of course. It requires much to be overborne. But it does not end the matter. Against it we have the judgment that comes from judicial experience with the conduct of criminal trials as they pass in review before this Court. An impressive series of cases in this and other courts admonishes of the temptations to abuse of police endeavors to secure confessions from suspects, through protracted questioning, carried on in secrecy, with the inevitable disquietude and fears police interrogations naturally engender in individuals questioned while held incommunicado, without the aid of counsel and unprotected by the safeguards of a judicial inquiry. Disinterested zeal for the public good does not assure either wisdom or right in the methods it pursues. A report of President Hoover's National Commission on Law Ob-

servance and Enforcement gave proof of the fact, unfortunately, that these potentialities of abuse were not the imaginings of mawkish sentimentality, nor their tolerance desirable or necessary for a stern policy against crime. Legislation throughout the country reflects a similar belief that detention for purposes of eliciting confessions through secret, persistent, long-continued interrogation violates sentiments deeply embedded in the feelings of our people. See *McNabb* v. *United States,* 318 U. S. 332, 342–43.

It is suggested that Haley's guilt could easily have been established without the confession elicited by the sweating process of the night's secret interrogation. But this only affords one more proof that in guarding against misuse of the law enforcement process the effective detection of crime and the prosecution of criminals are furthered and not hampered. Such constitutional restraints of decency derive from reliance upon the resources of intelligence in dealing with crime and discourage the too easy temptations of unimaginative crude force, even when such force is not brutally employed.

It would disregard standards that we cherish as part of our faith in the strength and well-being of a rational, civilized society to hold that a confession is "voluntary" simply because the confession is the product of a sentient choice. "Conduct under duress involves a choice," *Union Pacific R. Co.* v. *Public Service Commission,* 248 U. S. 67, 70, and conduct devoid of physical pressure but not leaving a free exercise of choice is the product of duress as much so as choice reflecting physical constraint.

Unhappily we have neither physical nor intellectual weights and measures by which judicial judgment can determine when pressures in securing a confession reach the coercive intensity that calls for the exclusion of a statement so secured. Of course, the police meant to

exercise pressures upon Haley to make him talk. That was the very purpose of their procedure. In concluding that a statement is not voluntary which results from pressures such as were exerted in this case to make a lad of fifteen talk when the Constitution gave him the right to keep silent and when the situation was so contrived that appreciation of his rights and thereby the means of asserting them were effectively withheld from him by the police, I do not believe I express a merely personal bias against such a procedure. Such a finding, I believe, reflects those fundamental notions of fairness and justice in the determination of guilt or innocence which lie embedded in the feelings of the American people and are enshrined in the Due Process Clause of the Fourteenth Amendment. To remove the inducement to resort to such methods this Court has repeatedly denied use of the fruits of illicit methods.

Accordingly, I think Haley's confession should have been excluded and the conviction based upon it should not stand.

MR. JUSTICE BURTON, with whom THE CHIEF JUSTICE, MR. JUSTICE REED and MR. JUSTICE JACKSON concur, dissenting.

The issue here is a narrow one of fact turning largely upon the credibility of witnesses whose testimony on material points is in direct conflict with that of other witnesses. The judgment rendered today by this Court does not hold that the procedure authorized by the State of Ohio to determine the admissibility of the confession of a person accused of a capital offense violates *per se* the Due Process Clause of the Fourteenth Amendment. It holds merely that the application made of that procedure in this case amounted to a violation of due process under the Fourteenth Amendment in that, on this record,

it amounted to a refusal by the trial court to exclude from the jury this particular confession which this Court is convinced was an involuntary confession.

The following facts are not disputed:

About midnight, on October 14, 1945, a storekeeper in Canton, Ohio, was shot to death in his store by one of two boys, Alfred Parks, aged 16, or Willie Lowder, aged 17. The accused, John Harvey Haley, then about 15 years and 8 months old and a senior in high school, was with these boys before they went into the store and was waiting for them outside of it at the time when the shooting occurred. Haley testified "all of a sudden I heard a shot and a man hollered, and I was scared and I ran." The two other boys also ran away immediately after the shot was fired. The three soon met and Haley then went home. These boys had been together all that evening. Early in the evening, while Parks and Lowder waited outside of Haley's home, Haley went in to get a pistol for their joint use. Without the knowledge of William Mack, the owner of the pistol, Haley took from a trunk a .32 caliber automatic pistol which Haley had shot once on New Year's Day and, from another place in his home, a handful of ammunition for the pistol. The three boys took part in loading it. Haley then turned it over to Parks and Lowder, one or the other of whom thereafter retained possession of it throughout the evening. A day or two after the shooting, Haley asked the two boys what they had done with the gun. He testified that in answer "They said they got rid of it." This much of the story Haley testified to at the trial and has admitted substantially ever since his arrest and since abandoning his first, and admittedly false, statement that he and his two friends had gone to a show that evening. A .32 caliber automatic Colt pistol, the admission of which in evidence is not here in issue, was sent by the Canton police to the Federal Bureau of Investigation for iden-

tification, together with the bullet which killed the store-keeper and a cartridge shell found by the police at the scene of the crime. An uncontradicted expert witness from the F. B. I. fired three bullets from the pistol, compared the microscopic markings on them with those on the bullet which had killed the storekeeper and, on this basis, positively identified the pistol as the weapon which had fired the fatal shot. This fatal shot admittedly was fired while Parks and Lowder were in the store of the deceased and were in possession of the pistol with which Haley had supplied them. There is nothing in the record to suggest the presence in the store of any other pistol. Haley testified that this pistol "looked like" the one he had given to his companions.

After hearing the foregoing and other material evidence, including the disputed confession of Haley, the jury found him guilty of murder in the first degree while attempting to perpetrate robbery. The verdict carried a recommendation of mercy which automatically reduced the statutory penalty from death to life imprisonment. In considering the record as a whole, and particularly in reaching a conclusion of fact that the police officers who examined Haley coerced him into making his confession, it is appropriate to note that the foregoing undisputed facts left comparatively little need for such a confession as was signed by Haley. That confession, in substance, added only the express statement by Haley that he knew that Parks and Lowder went into the store to rob the storekeeper and that Haley remained outside to serve as a lookout and to warn Parks and Lowder by tapping on the window in case anyone approached.

The procedure followed by the police as soon as they had the information upon which they arrested Haley was substantially as follows:

On Friday, October 19, 1945, again at about midnight, and while Haley was still up and about his home, after

having returned from an evening football game, he was arrested by four policemen who came to his home in two cars. They were admitted to Haley's home by his mother and they took him with them to police headquarters, not using handcuffs. He was "booked" there at about 12:30 a. m. From then until between 3 and 4 a. m. he was in the record room of the detective bureau, usually with two officers. What took place there leading up to his oral, and later signed, confession is the subject of directly contradictory testimony given by the accused and the police. Haley testified that he was roughly handled in such a manner that if this testimony is believed the confession was not voluntary. On the other hand, the police and everyone else who was present or saw Haley during or after this examination testified in detail, and with positiveness, that Haley was not abused or roughly handled in any degree and that his person and clothes presented a normal appearance after the examination. Immediately after Haley had been shown alleged confessions by Parks and Lowder and had read at least that by Parks, Haley made an oral statement evidently similar to that made by Parks. Thereupon, Haley was taken to a front room where a sergeant of detectives typed Haley's confession in question and answer form during a period which consumed from one hour to an hour and a half. Before taking this confession the sergeant testified that he typed and read to Haley, clearly and distinctly, the preliminary statement, a part of which is quoted in this Court's opinion as being at the beginning of the written confession. The sergeant testified that Haley, after hearing this introduction, said that he still desired to make a statement and tell the truth. When completed, the statement, so prepared, was signed by Haley in the presence not only of some of the police officers who had questioned him but also of two civilian witnesses called in for that purpose from outside of police headquar-

ters. The Acting Chief of Police, who himself was a member of the Bar of Ohio, requested Haley to read the entire confession. When this had been done, the Acting Chief of Police, in the capacity of a notary public, administered the oath signed by Haley at the end of the confession, stating that the facts contained therein were true and correct as Haley verily bevieved. A newspaper photographer then took a picture of Haley in company with Parks and Lowder. Either then or on the following Monday, the date being disputed, Haley was taken back to his home where the police found the trunk described by him as that from which he had taken the pistol. After his confession he was placed in the city jail and, on the following Tuesday, October 23, he was removed to the county jail. On that day, a complaint was filed in the Court of Common Pleas of Stark County, Ohio, Division of Domestic Relations, Juvenile Department, by a sergeant of police, charging Haley with being a delinquent child.

On October 29, 1945, pursuant to a motion of the prosecuting attorney, the judge assigned to the above-mentioned Domestic Relations Division of the Court of Common Pleas appointed a doctor to make a physical and mental examination of the accused.

On November 1, 1945, the mental and physical examination was filed and, after hearing, the court found—

"that the said child has committed an act which, if [it] had been committed by an adult, would be a felony; an examination having been made of the said John Haley by a competent physician, qualified to make such examination, it is ordered that the said John Haley shall personally be and appear before the Court of Common Pleas on the first day of the next term thereof to answer for such act."

On November 14, 1945, a transcript from the docket of the above-mentioned Juvenile Court was filed in the Court of Common Pleas. Thereafter, beginning with an in-

dictment for first degree murder which was returned on January 8, 1946, the case proceeded to arraignment on January 11, and to trial in the Court of Common Pleas March 25–April 3, when a verdict of guilty as charged was returned, with a recommendation of mercy. A motion for a new trial was overruled and the case was appealed to the Court of Appeals for Stark County, Ohio, and there was unanimously affirmed October 25, 1946. Appeal was made, both on a motion for leave to appeal and as a matter of right, to the Supreme Court of Ohio. The motion for leave to appeal was overruled and the appeal, as a matter of right, was dismissed by unanimous action of the five judges sitting in the case. The reason given for dismissal was that the court found that no debatable constitutional question was involved in the case.[1]

Beginning with the arraignment of the accused, the record shows that Haley has been represented by counsel. The case has proceeded in this Court *in forma pauperis,* the accused being represented by the same competent counsel who represented him in the state courts. It does not appear that the accused ever asked to have counsel appointed for him. It does not appear that, at any time before his arraignment, he employed counsel or asked for

---

[1] It appears from the opinion of the Court of Appeals for Stark County in this case that the three boys were separately indicted and tried. Lowder and Haley were tried by juries. Parks waived that right and was tried before three judges. Each was convicted of murder in the first degree, with a recommendation of mercy. Appeals from the three cases were heard together and the judgments were affirmed in each with a single opinion emphasizing the separate consideration that had been given to each. *Ohio* v. *Lowder, Ohio* v. *Haley, Ohio* v. *Parks,* 79 Ohio App. 237, 34 O. O. 568, 72 N. E. 2d 785. See also, *Ohio* v. *Haley,* 147 Ohio St. 340, 70 N. E. 2d 905; *Ohio* v. *Lowder,* 147 Ohio St. 530, 72 N. E. 2d 102; *Ohio* v. *Parks,* 147 Ohio St. 531, 72 N. E. 2d 81; where each appeal was dismissed for lack of a debatable constitutional question.

counsel to represent him. The nearest approach to such action is that disclosed by the testimony of Haley's mother and by a stipulation between the parties that Leroy Contie, an attorney, on Monday, October 22, was employed by Mrs. Haley to represent her son. Mr. Contie went to the city jail on two occasions *after* Haley's confession was signed, was unable to see him and was refused admission by the police authorities. Mr. Contie did not see Haley until after the latter had been transferred to the county jail, some days after that. He apparently did not become an attorney of record in the case.

It is not disputed on Haley's behalf that his arrest and uncoercive questioning after his arrest would have been proper under such circumstances. While the constitutional and statutory rights of the accused, under such circumstances, must be safeguarded carefully, it is equally clear that serious constitutional and statutory obligations rest upon law enforcement officers to discover promptly those guilty of such an unprovoked murder as had been committed. Likewise, the comparative youth of these three boys who now have been convicted of this murder is entitled to full recognition in considering the constitutionality of the process of law that has been applied to them. This has been done. Haley's youth was recognized expressly by the preliminary proceedings before the Juvenile Department of the Division of Domestic Relations of the local court. Those proceedings markedly differentiated the procedure from that ordinarily followed in the case of an adult. Undoubtedly the thought of Haley's youth was reflected in the jury's recommendation of mercy, and in the care which the sergeant and the Acting Chief of Police testified that they took in preparing his confession for signature and in seeing to it that Haley understood it and his rights in connection with it. It is necessary to recognize, on the other hand, that the offense here charged was not an ordinary juvenile offense. It

was a capital offense of the most serious kind. It involved the same fatal consequence to a law-abiding citizen of Canton as would have been the case if it had been committed by adult offenders. An obligation rests upon the police not only to discover the perpetrators of such a crime but also to determine, as promptly as possible, their guilt or innocence to a degree sufficient to justify their prosecution or release. It is common knowledge that many felonies are being committed currently by minors and an obligation attaches to law enforcement officials to punish, prevent and discourage such conduct by minors as well as by adults. If Haley's part in this crime had been reasonably suspected by the police immediately after its commission at midnight, October 14, the police would have deserved severe criticism if they had not arrested and questioned him that night. The same obligation rested on them, five days later, at midnight, October 19.

As admitted by the petitioner in this Court, the entire issue here resolves itself into a consideration of the methods used in obtaining the confession. This in turn resolves itself primarily into a question of the credibility of witnesses as a means of determining the contested question as to what methods in fact were used. A voluntary confession not only is valid but it is the usual, best and generally fairest kind of evidence. Often it is the only direct evidence obtainable as to the state of mind of the accused. The giving of such a confession promptly is to be encouraged in the interest of all concerned. The police are justified and under obligation to seek such confessions. At the same time, it is a primary part of their obligation to see to it that coercion, including intimidation, is not used to secure a confession. It should be evident to them not only that involuntary confessions are worthless as evidence, but that coercion applied in securing them itself constitutes a serious violation of duty.

The question in this case is the simple one—was the confession in fact voluntary? As in many other cases it is difficult, because of conflicting testimony, to determine this controlling fact. It may not be possible to become absolutely certain of it. Self-serving perjury, however, must not be the pass-key to a mandatory exclusion of the confession from use as evidence. It is for the trial judge and the jury, under the safeguards of constitutional due process of criminal law, to apply evenhanded justice to the determination of the factual issues. To do this, they need every available lawful aid to help them test the credibility of the conflicting testimony.

Due process of law under the Fourteenth Amendment requires that the states use some fair means to determine the voluntary character of a confession like that in this case. The procedure may differ in each state. The form adopted by Ohio is not criticized by this Court. The sole question here is the validity of the application of the Ohio procedure to the facts of this case. That application can be tested in this Court only under the great handicap of attempting to appraise, by use of the printed record, the action of the trial court and jury taken in the light of the living record. In connection with every confession that is unaccompanied by testimony as to how it was secured, all sorts of conditions may be conjectured as to the methods used to secure it. To rely upon conjecture, either in favor of or against the accused, is not justice. It is not due process of law by any definition. Similarly, all sorts of conditions as to the methods which might have been used in obtaining such a confession may be conjectured by a witness and falsely testified to by him. Such action puts the true testimony into direct conflict with the false. In the present case, the conflict of testimony is so clear that it is evident that one or more of the witnesses must have committed perjury. The issue resolves itself, therefore, not into one of civil rights

but into one of the truth or falsity of the testimony as to the methods used in obtaining Haley's confession. This issue of credibility cannot be resolved here with nearly as good a chance of determining the truth as that which was enjoyed by the trial court and jury. They saw and heard the witnesses and they examined the exhibits. Furthermore, they and the State Appellate and Supreme Courts also were familiar with the general conditions and standards of law enforcement in effect in the long-established industrial civic center of over 100,000 people of Canton, Ohio, where this confession was made and used. The testimony of the witnesses as to the methods used should be read in the context of the community where such testimony was given in order for it to be fairly appraised. There is no suggestion that racial discrimination or prejudice existed in the attitude of any of the witnesses, or of the courts or of the community of Canton. The issue is the credibility of these particular police officers and other local witnesses. It cannot be determined on the basis of published reports, however authentic, of police methods in other communities in other years. "The mere fact that a confession was made while in the custody of the police does not render it inadmissible." *McNabb* v. *United States,* 318 U. S. 332, 346.

The present case, turning as it does upon the credibility of the testimony as to the existence of the coercion, if any, that was used to secure the confession, is readily distinguishable from cases relied upon by the accused. For example, in the present case, this Court does not rely on any claim that the confession was elicited by unreasonably delaying the arraignment of the accused or even by any alleged delay in charging him with delinquency in the Juvenile Court. The confession of the accused was given, transcribed and signed

by 5:30 a. m. on October 20, immediately following his arrest at about midnight. There is, accordingly, no basis for contending that there was unnecessary delay in taking the accused before a court or magistrate having jurisdiction of the offense insofar as such unnecessary delay, if any, had relation to the confession. Whatever delay there was occurred after the confession was made and it is obvious that it was not unreasonable to delay the taking of the accused before a court or magistrate at least until after 5:30 a. m. *United States* v. *Mitchell,* 322 U. S. 65. Cf. *Anderson* v. *United States,* 318 U. S. 350; *McNabb* v. *United States,* 318 U. S. 332.

If the unequivocal and consistent testimony of the several police officers is believed, including that of the Acting Chief of Police, the confession was clearly voluntary. The police officers were men of experience in the local detective service and, if inferences are to be indulged in, it may be inferred that they understood the necessity that the confession be uncoerced and voluntary if it was to be admissible in evidence. The principal examining officers were two detectives, one of nine and the other of eleven years' police service. The sergeant of detectives who typed the confession was a man of nine years' police service. Every policeman who took any part in the examination was called as a witness. Each testified that there was no use of force and no intimidation during the examination. Each testified that in fact the confession was uncoerced. The questioning of the accused was described as having been carried on while the parties to it were seated near a desk and not within arm's length of each other. It was conducted in the record room of the detective bureau, rather than in jail. The accused was not handcuffed nor subjected to indignities. The police, the newspaper reporter, and the iceman who was brought in to witness the accused's signature to the confession tes-

tified to the normal appearance of the clothing and person of the accused during or following the examination, including the time he was photographed. The witnesses testified only as to what they severally had observed during the respective periods that they were present but, together, they covered the entire period of the examination. If the confession was in fact voluntary, these witnesses could not have said more to prove it. If their testimony is true, it makes false much of the testimony of the accused. The testing of the credibility of this testimony is therefore important. This testimony, furthermore, should not be laid aside here merely because it is in conflict with opposing testimony. If the trial court and jury believed the police and disbelieved the accused on this testimony, there was no substantial ground left for any inference of coercion. If, on the contrary, they believed the accused and therefore concluded that the police and other witnesses agreeing with them were perjurers, the trial court could not fairly have admitted the confession in evidence.

The evidence in the record includes ample evidence to support the action taken by the trial judge and jury against the accused if this Court chooses to believe that evidence and to disbelieve the conflicting evidence. Furthermore, that evidence, if so believed, is strong and specific enough greatly to offset conflicting inferences which otherwise might be suggested to this Court by the undisputed evidence.

As a reviewing court, we have a major obligation to guard against reading into the printed record purely conjectural concepts. To conjecture from the printed record of this case that the accused, because of his known proximity to the scene of the crime and his known association that night with the boys, one of whom did the actual shooting, must have been a hardened, smart boy, whose

conduct and falsehoods necessarily made all of his testimony worthless *per se,* is as unjustifiable as it would be to assume, without seeing him or his mother as witnesses, that he was an impressionable, innocent lad, likely to be panic-stricken by police surroundings and that all his testimony must be accepted as true except where expressly admitted by him to have been false. To assume from the printed record that the policemen, including the Acting Chief, and the civilians who gave unequivocal testimony as to the absence of force and intimidation in securing the confession or as to the normal appearance of the accused and of his clothing at the time of making the confession, were callous as to the feelings of a boy 15 years of age or were guilty of deliberate perjury would be as unjustifiable as it would be to assume, without hearing and seeing the respective police officers, as witnesses, that each of them was as well-informed, tolerant and thoughtful as an ideal juvenile judge. In this case, this Court seems to have laid aside all the conflicting testimony and then, without seeing or hearing the witnesses, has attempted to draw, from the meager balance of the record, important inferences of callousness and coercion on the part of the examining officers. By disregarding the conflicting material testimony instead of choosing between the true and the false material testimony, the material record is reduced largely to isolated items of subsequent conduct on the part of certain police officers who are alleged to have hampered the boy's mother or an attorney in trying to see him several days after his confession. There is no likelihood that these officers were the same ones who conducted the examination.[2] It

---

[2] In a case which arose in the District of Columbia, this Court said:

"But the circumstances of legality attending the making of these oral statements are nullified, it is suggested, by what followed. For

is not enough for this Court to say in its opinion today that if "the undisputed evidence suggests that force or coercion was used to exact the confession, we will not permit the judgment of conviction to stand . . . ." Recognition must be given also to the right of the trial court to weigh the credibility of the material disputed evidence.

We are not in a position, on the basis of mere suspicion, to hold the trial court in error and to conclude "that this was a confession wrung from a child by means which the law should not sanction." While coercion and intimidation in securing a confession should be unequivocally condemned and punished and their product invalidated, nevertheless such coercion should not be presumed to exist because of a mere suggestion or suspicion, in the face of contrary findings by the triers of fact. On the basis of the undisputed testimony relied upon by this Court, it is not justified in making such a determination of "the callous attitude of the police" of Canton as thereby to override not only the sworn testimony of the State's public officials but also the conclusions of the triers of fact. The trial judge, with his first-hand knowledge, both of the credibility indicated by the testimony in open court and of the habitual "attitude of the police"

not until eight days after the statements were made was Mitchell arraigned before a committing magistrate. Undoubtedly his detention during this period was illegal. . . . Illegality is illegality, and officers of the law should deem themselves special guardians of the law. But in any event, the illegality of Mitchell's detention does not retroactively change the circumstances under which he made the disclosures. These, we have seen, were not elicited through illegality. Their admission, therefore, would not be use by the Government of the fruits of wrongdoing by its officers. Being relevant, they could be excluded only as a punitive measure against unrelated wrongdoing by the police. Our duty in shaping rules of evidence relates to the propriety of admitting evidence. This power is not to be used as an indirect mode of disciplining misconduct." *United States* v. *Mitchell,* 322 U. S. 65, 70–71.

of Canton, if there be any such attitude, found to the contrary. That judge and the law enforcement officers of Canton have been entrusted by the State of Ohio with the enforcement of the constitutional obligations of the public to each individual and also of each individual to the public. In the absence of substantial proof to upset the findings of the trial court, these public officers should not be charged with callousness toward, or with violation of, their constitutional obligations.

The legal process governing the admission of confessions in evidence in jury trials in Ohio in a case like this takes these conditions into consideration. The Ohio procedure provides for a preliminary examination by the trial judge, out of the presence of the jury, to determine whether the confession should be excluded as involuntary. Such an examination was made at length in this case and the judge, in the absence of the jury, overruled the objection made to the confession upon such ground. The motion was renewed in the presence of the jury and again denied. The judge likewise refused to direct a verdict for Haley at the close of the State's case and again at the close of the entire case. The admissibility of the confession was fully argued in the trial court and, before its admission, the trial judge took the subject under advisement while he adjourned the hearing over a week end. Having decided that the confession was not to be excluded, it was his duty to submit it to the jury. He did this with ample instructions advising the jury of its responsibility in connection with the confession. Testimony then was given at length, in the presence of the jury, bearing upon the voluntariness of the confession as well as upon the probable truth or falsity of its contents. The final instructions of the court emphasized not only the obligation and opportunity of the jury to pass upon the voluntariness of the confession but also its obligation to give appropriate

622

weight to the confession in the light of all the testimony in the event that the confession was found by the jury to have been a voluntary one.[3]

[3] The trial court included in its final instructions to the jury the following:

"You will recall that I have heretofore said to you that, in general, the judge determines the admissibility of evidence. But, you will recall I think that on Monday just before certain alleged statements or declarations claimed by the State to have been made by the defendant, in part oral and in part consisting of an alleged written or typed statement or declaration, identified as State's Exhibit D, were by the judge permitted to be introduced with the instruction that you the jury would in the end and finally, determine first, whether the defendant made said statements and declarations, and if he did make it, whether they were made by the defendant voluntarily and of his own free will; and further in the event you should find he did make them and made them voluntarily and of his free will, just what weight, if any, should be accorded them.

"I now again direct your attention to that evidence. The State claims the defendant made said statements and declarations and that he made them voluntarily and of his own free will. The defendant denies the State's said claims and asserts they were not made voluntarily and of free will. You will decide these questions from all the evidence in the case. Should you find from all the evidence that the defendant did not make them, or if he made them that he did not make them voluntarily and of his free will, you will in that event disregard them entirely and not consider them further. On the other hand, should you find defendant did make them and that he made them voluntarily and of his own free will, you will consider them as evidence and give them just such weight to which you find from all the evidence they are entitled. Should you find from the evidence that some of them were made by the defendant and by him made voluntarily and of his free will, and find others were not made by him, or if made by him, not made by him voluntarily and of his free will, you will consider only those you find were made by him voluntarily and of his free will and reject the others. You will consider the alleged oral statements or declarations, separate and apart from the said written or typed statements, and the circumstances incident to each.

"You are instructed further that statements of guilt or declarations of guilt as they are sometimes called, made through the influence of

The rule of law governing this case is stated in *Lisenba* v. *California,* 314 U. S. 219, 238:

> "There are cases, such as this one, where the evidence as to the methods employed to obtain a confession is conflicting, and in which, although denial of due process was not an issue in the trial, an issue has been resolved by court and jury, which involves an answer to the due process question. In such a case, *we accept the determination of the triers of fact, unless it is so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process.*" (Italics supplied.)

This Court properly reserves to itself an opportunity to consider the record in a case like this independently from the consideration given to that record by the lower courts. However, when credibility plays as large a part in the record as it does in this case, this Court rarely

---

hopes or fears, statements or declarations induced by promises of temporal benefit or threats of disadvantage, are to be weighed and not to be considered of any value. Statements and declarations which are not voluntary and of free will made, are excluded on the ground that they are probably not true. Another ground for the exclusion is that it is a violation of the constitutional provision that no man shall be required to give evidence against himself, for if he is compelled by threats or induced by hopes to make confession against himself, it is an indirect method of compelling him to give evidence against himself, when statements or declarations made under such circumstances are afterwards proven against him in court. On the other hand, a free will and voluntary statement or admission, made by a defendant against his interest, *against his interest,* is one of the most satisfactory proofs of guilt, for an innocent person will not voluntarily subject himself to infamy and liability to punishment by false statements against himself.

"The State having offered these statements or admissions, must prove that they were made; but the burden of proving that a particular statement or admission was obtained by improper inducements, in general, is upon the defendant."

can justify a reversal of the judgment of the trial court and the verdict of the jury. This is increasingly true where the judgment of the trial court has been affirmed, as here, by two State courts of review. In the preliminary examination as to the admissibility of the confession in this case, the trial court may have believed the police and disbelieved the accused. On that basis, there is more than ample evidence to support the trial court's conclusion in refusing to exclude the confession. A similar statement may be made as to the presentation of evidence to the jury. It is not justifiable for this Court, in testing the conclusions of the triers of fact, to rely on inferences drawn solely from those portions of the record which, when read separately, apparently were not disputed. The acceptance of one version or the other of the sharply conflicting testimony which was before the triers of fact could reasonably justify a conclusion of the trial court and jury to exclude or admit the confession without reference to, or even in spite of, implications which might be drawn from the comparatively colorless undisputed testimony if that undisputed testimony stood alone. This Court should include in its appraisal of the record not only the undisputed testimony, but it also should allow for a reasonable conclusion by the trial court and jury, based upon acceptance or rejection of the disputed testimony. On this basis, this Court is not justified, in this case, in holding that the determination by the trial judge that the confession was admissible, or that the holding by the trial jury that the confessor was guilty, "is so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process." [4]

In testing due process this Court must first make sure of its facts. Until a better way is found for testing credibility than by the examination of witnesses in open court,

_____

[4] See *Lisenba* v. *California, supra,* p. 238.

we must give trial courts and juries that wide discretion in this field to which a living record, as distinguished from a printed record, logically entitles them. In this living record there are many guideposts to the truth which are not in the printed record. Without seeing them ourselves, we will do well to give heed to those who have seen them.