THE STATE OF OHIO, APPELLEE, *v.* STEWART, APPELLANT.*

(No. 5275—Decided February 27, 1963.)

*Mr. John S. Ballard*, prosecuting attorney, for appellee.
*Messrs. Harris, Sacks, Subrin & Goldman*, for appellant.

DOYLE, J. This appeal brings up for review the judgment in the trial of Richard John Stewart, a minor, aged seventeen and one-half years at the time of his crime, for the killing of Judy Sooy, an eighteen-year-old freshman student in Kent State University.

A jury was duly waived under the state law, and a court consisting of three judges of the Court of Common Pleas of Summit County conducted a lengthy hearing upon the issues made by the defendant's pleas of not guilty, and not guilty by reason of insanity, to the indictment charging him with murder in the first degree. At the conclusion of the trial, the accused

*Judgment affirmed, 176 Ohio St., 156.

was found guilty of murder in the first degree without a recommendation of mercy. The extreme penalty was imposed.

The crime charged in the indictment falls within the provisions of Section 2901.01, Revised Code. This section appears as follows:

"No person shall purposely, and either of deliberate and premeditated malice, or by means of poison, or in perpetrating or attempting to perpetrate rape, arson, robbery, or burglary, kill another.

"Whoever violates this section is guilty of murder in the first degree and shall be punished by death unless the jury trying the accused recommends mercy, in which case the punishment shall be imprisonment for life.

"Murder in the first degree is a capital crime under Sections 9 and 10 of Article 1, Ohio Constitution."

Under Sections 2945.05 and 2945.06, Revised Code, a defendant may waive a jury trial under an indictment charging murder in the first degree, and a three-judge court is empowered to hear the evidence, render its judgment in like manner as a jury, and sentence the accused within the limits of the statute.

In this case the defendant exercised the right given by the statutes of waiving a jury, and, by doing so, he made the judges the triers of the facts, with the right to grant or withhold mercy within their sound discretion, after finding the defendant guilty of murder in the first degree.

In the accused's appeal, he makes the following assignment of errors:

"1. That the court erred in admitting the confession of the accused.

"2. That the court erred in failing to find the accused not guilty by reason of insanity.

"3. That the verdict finding the defendant guilty was not supported by sufficient evidence to prove beyond a reasonable doubt either the element of a purposeful killing or the element of deliberate and premeditated malice.

"4. That the verdict is against the weight of the evidence; and the court erred in refusing to set it aside.

"5. That the appellant was denied a fair trial by reason of permitting the prosecutor to argue matters unsupported by evidence.

"6. That the verdict and judgment are contrary to law.

"7. That the trial court erred in failing to set aside the verdict upon appellant's motion for a new trial and to grant appellant a new trial.

"8. That other errors apparent on the face of the record occurred at the trial of the prejudice of the appellant which prevented appellant from having a fair trial."

On September 2, 1961, the appellant, Stewart, lured, by ruse, Judy Sooy into the home of his parents in Cuyahoga Falls, Ohio, where he resided, and in the basement thereof struck her violently on her head with a hammer, which he carried concealed from her. During the first series of blows the victim fell to the floor, dazed and only partly conscious, if conscious at all, and bleeding profusely. In a period of seconds she partially revived, and, while screaming, she attempted to fight off her assailant, whereupon she was again struck a series of blows on her head with the same instrument. While she was crawling on the floor in an attempt to evade further assault, the assailant got onto her back and attempted to strangle her with his hands. Failing to stop her struggles by this method of attack, he stuffed a handkerchief deep in her mouth as a gag, and then took from the pocket of his clothing a length of rope, looped it around her neck, and pulled on the two ends with his entire strength. Failing again to stop her struggles he placed his knee in the small of her back and pulled on the rope, thereby lifting her head and shoulders from the floor; he then pulled the rope tight around her neck and knotted it on the rear of her neck. The victim's struggling ceased, and she died. The assailant then made his escape. The coroner testified that the victim died from anoxic anoxia resulting from "strangulation by ligature."

The statement of facts stands uncontradicted and is based upon the testimony of the appellant, who testified at the trial in his own defense, coupled with a description by the coroner of the brutally mangled and tortured body of the deceased.

The coroner testified:

"The internal organs of the neck showed massive injury. All of the muscles around the larynx and particularly around the thyroid cartilage, which is the part of the larynx which causes the protrudence of the neck, which is called the Adam's Apple, all of the muscles were filled with blood. There had been

great pressure applied from the outside in that area. The thyroid cartilage which forms part of the larynx was mobile. That is, it was practically floating due to the fact that it had been dislocated and separated from some of the ligaments and the ligaments adjoining it to other parts of the neck. The thyroid cartilage was fractured. The inside of the larynx was cyanotic; that is, blue. All of these things were evidence of massive injury and of great force, squeezing force, applied to the neck.''

The coroner further testified, as follows, in response to questions directed to his findings in the area of the head:

''* * * there was marked bruising of the aponeurosis of the skull. The aponeurosis is the tough, fibrous covering underneath the scalp, between the scalp and the bones of the skull. There was marked bruising there. Beneath the laceration in the right parietal area * * * were two linear fractures. By that I mean fractures that were just straight. One of them was three-sixteenths of an inch and one was an inch long * * *. The brain showed evidence of increased intracranial pressure, pressure inside the cranium was greater than normal. There was congestion around the arachnoid, which is one of the three coverings of the brain.''

The appellant's brief reflects the record of events following the killing. It reads, in part:

''The entire episode in the basement consumed only a relatively short time, a matter of minutes. When he left her in the basement, he went upstairs, drank a large amount of ice water, retched, and, because he was covered with blood, took a short bath, after which he went to the basement to fetch his glasses, which were dislodged during the hammer episode. He left his jockey shorts in the basement, which he had used to wipe some blood from his shoes.

''The girl was left lying there. The hammer, sock, rope and gag were left by him untouched. The ether can and all the other paraphernalia he gathered while thinking in terms of etherizing her were left untouched. He then left in his car and headed for the Pennsylvania Turnpike. The only money he had was what was in the girl's purse, about $10, which she left in the car when she accompanied him into the house. On the turnpike he had a flat tire. He then abandoned the car, threw the

purse away, and for almost a month thereafter traversed the country, north to south and east to west, until he was picked up by the Monterey, California, police, while trying to get on a turnpike to continue his odyssey and wanderings.''

The facts heretofore related, which describe the killing, are a condensation of the appellant's testimony on the witness stand during the trial. The evidence relating to instruments used in the killing, his bloodstained clothing, and the discovery of the victim's empty purse near his abandoned automobile at Carlisle, Pennsylvania, of course was given by others, who testified to their own knowledge of the facts.

Following the appellant's arrest in California, he made a confession to the details of the killing, which was admitted in evidence in the trial over his objection. The first assignment of error relates to the claim that its admission was prejudicially erroneous. We therefore turn to circumstances attendant at the time.

As indicated above, the appellant was arrested for vagrancy on October 1, 1961, in Monterey, California, approximately one month after the killing. He told the police that his name was William Johnson, and that he was nineteen years of age. He was placed in jail after the arrest.

On the following day, the Monterey police questioned him concerning his true identity, because there had been found his wallet, which he had discarded in a wastepaper basket in the police station and which wallet contained records of his real identity. During this questioning, on October 2, 1961, the police found that his real name was Richard John Stewart, and that he was wanted for murder in Ohio. California police immediately notified the Cuyahoga Falls, Ohio, police of the arrest, whereupon, on the same day, October 2, 1961, George Pappas, an assistant prosecuting attorney of Summit County, and two Cuyahoga Falls, Ohio, police officers flew to the California city.

Upon arrival, near midnight of October 2nd, the Ohio officials arranged to interview the appellant. He was brought from his cell to one of the offices in the police station, and there he was asked whether he cared to make a formal statement. He answered that it was his wish to do so. The assistant prosecuting attorney then told him that ''he would not be compelled to give a statement. * * * if he wanted to give a statement it

would be by his own free will and that statement would be used for or against him in court."

He was also advised that he could secure the services of an attorney. The assistant prosecuting attorney further testified that the appellant was advised of his constitutional rights. This testimony was not refuted.

The appellant again expressed his desire to make a formal statement, and he then described in detail the events leading up to and the actual killing of the girl. After the confession of about thirty minutes duration, he was taken back to his cell.

On the following morning at about 9 a. m., the assistant prosecuting attorney phoned the juvenile judge of Los Angeles County and informed him of the facts which were then known. The judge instructed the Ohio officers to return the appellant to Ohio. Immediate flight passage was then secured, and the Ohio officers and the appellant arrived in Cleveland at about 4:30 p. m. on October 4, 1961. They then proceeded from the Cleveland airport to the Cuyahoga Falls police station, and immediate contact was made with the judge of the Juvenile Court of Summit County. Pursuant to the judge's instructions, the appellant was taken to the Summit County Detention Home, where he was placed in the control of the juvenile authorities. Subsequently, the Juvenile Court, after hearing, released the appellant to the jurisdiction of the Court of Common Pleas.

The first assignment of error is:

"The court erred in admitting the confession of the accused, Richard John Stewart."

The appellant asserts that:

"When a boy, 17, more than 2,000 miles from home, is confronted and surrounded by an array of police authorities, including an assistant prosecuting attorney, two detectives, a police lieutenant, a court reporter and a soundscriber, with nobody there to represent him 'such confessions are obtained by secret inquisitorial process (*Chambers* v. *Florida*, 309 U. S., 227, 237) and are suspect, since such procedures are conducive to the use of physical and psychological pressures.' *Gallegos* v. *Colorado*, 370 U. S., 49, decided June 4, 1962, two days before the trial of Stewart."

It is argued that the use of the confession in the trial must be condemned because of the "compound of two influences"

analyzed in *Gallegos* v. *Colorado*, 370 U. S., 49, 8 L. Ed. (2d), 325, 82 S. Ct., 1209, the first of which is the procedural requirement, and the second, the element of compulsion.

The Ohio procedure is stated in Section 2151.25, Revised Code, as follows:

"When a child is arrested under any charge, complaint, affidavit, or indictment, whether for a felony or a misdemeanor, such child shall be taken directly before the Juvenile Court. * * *"

There is no prohibition in this requirement against the interrogation of a minor by police officers following his arrest, and before he is taken before a Juvenile Court. The statute provides only that he "shall be taken directly before the Juvenile Court."

In the case before us, the California police were justified in believing that the appellant was not a minor, for the reason that he falsely told them when arrested that he was nineteen years of age. When the Ohio authorities reached California, at the earliest possible time after notification and on the evening of the day following the arrest, they had no opportunity in the middle of the night to take him "directly" before a California Juvenile Court, even if the Ohio statute directed it. The law does not require the impossible.

On the following day, with the acquiescence of the appellant and by the direction of the California juvenile judge, they flew to Ohio on the first available plane and, upon arrival at the Cleveland airport, proceeded to the Cuyahoga Falls police station and from there directly to the juvenile authorities.

It was perhaps a statutory violation to fingerprint and book the appellant at the police station; however, this police procedure could not possibly have prejudiced him in his subsequent trial in the Court of Common Pleas upon the indictment for murder in the first degree. In fact, Section 2151.31, Revised Code, provides, in part:

"* * * that any child recognized to the Court of Common Pleas, under Section 2151.26 of the Revised Code, shall not be exempt from fingerprinting and photographing."

For a court to rule that this short stop at the police station and the booking and fingerprinting of the appellant constituted a denial of due process, and thereby prejudicial error in the

state's case, to one who is later ordered by the Juvenile Court to appear before the Court of Common Pleas to answer to a charge of murder would be carrying the rule of due process to absurd limits. It must be recognized that the offense charged in the indictment is not an ordinary juvenile offense. It is a capital offense of the most serious kind.

In respect to the element of compulsion, the appellant states that the "procurement of the confession * * * is so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear."

We find nothing in the record to substantiate this claim. In fact, the appellant was treated kindly and with consideration by the officials. He was advised of his legal rights, and there is nothing to indicate that he did not understand them. It appears that he desired to make a full confession of his conduct and be returned to Ohio to answer for his transgression. The confession, in major part, contained the same facts relative to the killing which he later stated from the witness stand in the trial. In the confession, however, he said that, after striking his victim with the hammer, she continued to scream, and then he said, "I realized I would have to kill her." Following this statement, he told of the later strangulation.

On the witness stand during the trial he denied an intention to kill, and stated that his intentions were only to ease her pain after beating her with the hammer.

He testified that he was a chronic masturbater, that, on the day of the killing as he drove his automobile past the Sooy home, he was seized with a strong urge to see the girl in the nude, and that he experienced an erection at the time (this despite the fact that their acquaintance was extremely casual). He said the urge to see her, masturbate and get relief grew stronger. He then formulated a plan to gain her company and to "put her to sleep by using ether." After securing the ether at a drugstore, he proceeded to his home, and then the urge to see her grew stronger, with the result that he "had to resort again to masturbation," but "it didn't help."

After reading the instructions on the ether can, he abandoned the idea of using ether because of the danger that "it could be fatal if a person wasn't experienced in using it."

His testimony continued:

"And before I called the girl I masturbated again, and this again did not help. I mean I still wasn't relieved. It was that much stronger, it seemed. So then I called the girl, called Judy, and I represented myself as Jim Bell whom I knew was a member of her class [in school] and he was fairly popular, and I told her we were having a party out at Jim's farm * * *, and I explained to her that I would have somebody else pick her up, possibly Jim Albertson. She consented."

After these plans were made, he went into the garage of his home "and got the hammer and also * * * a length of rope * * *, and when I came back in the house I remember that I went upstairs and obtained a sock from my dresser drawer. * * * I put the sock over the head of the hammer, and the reason for that was that—it seems ridiculous to me now—but at that time I didn't want to hurt her. I didn't want this to break her flesh in any way, just as if that would afford a cushion, like if a person gets hit with a boxing glove, but it was a thin cotton sock that I put over the hammer. And I had this length of rope * * *. And during the time after I had the stuff ready I believe I sat around the house * * *. I masturbated once again thinking this would be relieved, but still it wasn't. So, * * * around 9:15, * * * I left the house."

Question: (by appellant's counsel) "All right; while you were in the house and while you had obtained these items which you related, did you have any plans with regard to having intercourse or raping this girl?"

Answer: "No, I didn't * * *. I read in health class, physical hygiene, this could happen to a girl and she could be hurt physically and also could be harmed mentally someway. I had no intention of hurting her at all."

Question: "All right. Now go ahead and tell us what happened after that, when you picked her up * * *."

Answer: "Well, I left the house like I said around 9:15 * * *. I drove in * * * by where she was and I believe I stepped out of the car and told her I was to pick her up for the party. She said 'Hi' and got in the car. I told her my name. I said 'my mine is Rick Stewart' and more or less introduced myself at that time. And we left from there and we drove—pardon me a minute—when I went out to the car to leave I brought the

hammer and the piece of rope and I believe I also had a hand-kerchief * * * which I was going to use as a gag, plus I also had the sock over the top of the hammer * * * [and] if the opportunity arose I was going to knock her out in the car. * * * During all this time I still had this urge so predominant that I couldn't control it at all. * * * I proceeded to go to my house from there and I explained to her then I had to pick up some records and a record player, * * * which I was to take to the party and she said it would be o.k. and so we went on to my house * * *.

"* * * I got out of the car and she got out also * * * and we walked to the door * * * and she walked in ahead of me, and so from there we went up into the living room * * * we looked around there for a little bit under the pretense that we were looking for the records * * *. And so then we walked upstairs, she followed me, and we went upstairs into my bedroom, and she came in and looked around there for a minute. I turned around and I said 'it must not be here,' and during all this time I had the hammer with me. I had it on my left side. I carried it in my left hand and I had the handle of the hammer between my left forearm and my left leg, and if she noticed it she didn't say anything. * * *

"So we came downstairs * * * on down to the basement. When we got to the basement we went over by my father's work-bench and there was the first time she bent over and I raised the hammer at that point to strike her. When I did that * * * it was * * * as if a force had grabbed my arm and held it. I remember I looked out of the corner of my eye, I saw something from the corner of my eye and I turned my head to look at it and it was as if I was looking into a mirror, it was actually a vision * * * it was me, a picture of my waist up, I don't believe my legs or anything was showing, it was very distinct * * *, I had a real hideous expression on my face. I had the hammer raised above my head. I thought, 'My God, what am I doing—why am I doing this.' * * * It just lasted a couple of seconds and then it went away and I was back like I was.

"And I went ahead and lowered the hammerd to my side and I turned around and I walked over to the other side of the basement. And then during that time she had raised back up and she walked over by the furnace. And then I walked over

behind her and she bent over and I raised the hammer again. I remember I struck her about six or seven times. It was in the back and on the top of the head. She fell to the floor and she just blacked out for just a couple of seconds * * *. She fell on her stomach and I remember she started—she came to and she— I remember she rolled over on her back, I believe, and started to raise up and then I started to strike her again. It was during this second succession of blows, I think, I hit her maybe three or four times in all, and she started bleeding pretty bad and I realized then how much pain she was going through, and the sock which I put over the head of the hammer wasn't doing a bit of good, its intent and purpose wasn't there. And then I realized I had to do something for her, I had to help her.

"And the only thing I could do then, I remember it, I had —well before that I started to strangle her with my hands. I don't know—she just kept moaning. It kept going through my mind—my mind was all messed up inside and I couldn't think. I knew I had to help her someway to keep her from having all this pain. So I went ahead and started to strangle her with my hands. And I couldn't seem to get enough power out of my hands, she was still moaning. It seemed so urgent. So I remembered the rope which I had in my back pocket and I took the rope out and I placed it around her neck then. And then she was on her stomach and I straddled her back. I remember I started to strangle her with the rope at that time.

"And then I believe I put my knees or my foot or something on the small of her back and I raised up, I believe, I kept putting so much pressure on because—all that kept going through my mind is that I've got to help her, I have got to help her. * * * And so I went ahead and I tightened the rope and I tied a knot in it. Then the respiration or breathing was very slow, but she seemed to be quiet—she seemed to be o.k. She wasn't in any more pain."

From this point on in the appellant's testimony he related the events of his flight, which stand, in most part, uncontradicted in the record.

From the admitted and uncontradicted facts established in this case, there is sufficient evidence, without the confession, to justify a first degree murder conviction. However, if the evidence "suggests that force or coercion was used to exact the

confession," a judgment of conviction may not be permitted to stand, "even though without the confession there might have been sufficient evidence" for conviction. *Haley* v. *Ohio*, 332 U. S., 596, 599, 92 L. Ed., 224, 68 S. Ct., 302.

In *Gallegos* v. *Colorado, supra*, the writer of the majority opinion, when speaking of the compound of two influences as making a confession suspect, observed that "there is no guide to the decision of cases such as this, except the totality of circumstances that bear on the two factors we have mentioned."

As we view the "totality of circumstances," we find nothing to make the confession anything other than completely voluntary, given without force or coercion, unless we are willing to say that every seventeen-and-one-half-year-old high school senior who kills another for no apparent reason, except for his own lustful designs, and then confesses to the facts of the killing immediately after his apprehension, has not enough maturity to make a volunutary confession without force or coercion. This, we cannot say. It is not the law.

It is our conclusion that, in this case, we must accept the determination of the triers of the facts when the confession was admitted in evidence after a full hearing thereon. It is our opinion that the trial court properly found from the evidence before it that the constitutional and statutory rights of the accused were carefully safeguarded. And in this connection it must be borne in mind that serious constitutional and statutory obligations also rested upon the law enforcement officers to discover and apprehend promptly one guilty of such an unprovoked murder as is shown to have been committed in the instant case.

We distinguish the cases of *Haley* v. *Ohio, supra*, and *Gallegos* v. *Colorado, supra*, upon which the appellant so greatly relies.

The second assignment of error is stated as follows:

"The court erred in failing to find the accused not guilty by reason of insanity."

The rule of legal sanity followed in this state for many years is stated succinctly in paragraph 15 of the syllabus in *State* v. *Frohner*, 150 Ohio St., 53. It is:

"15. A person accused of crime who knows and recognizes the difference between right and wrong in respect of the crime

with which he is charged, and has ability to choose the right and abjure the wrong, is legally sane.''

It also may be said that an accused person is not legally responsible for the killing of another if, at the time of the killing, he was laboring under such a defect of reason as not to know the nature or quality of the act he was doing.

Various experts in the area of mental illness testified in this case. Their conclusions on the questions presented were not in harmony. There is, however, sufficient testimony in the record for the triers of the facts to have found not only that the defendant had failed to establish by a preponderance of the evidence the defense of insanity, but that, from the testimony of the experts and the reasonable inferences to be drawn from all the evidence, the accused was legally sane at the time of the commission of the crime.

We can find no error here.

The third assignment of error reads:

''The verdict finding the defendant guilty was not supported by sufficient evidence to prove beyond a reasonable doubt either the element of a purposeful killing or the element of deliberate and premeditated malice.''

This homicide was carried out without witnesses (as are most murders). It was the right and duty of the trial court to draw reasonable inferences from the physical facts proved, the testimony of the accused on the witness stand, and the extra-judicial statements; it was likewise the right of the court to draw from the evidence the inference of fact that the accused intended to kill, which result, in the normal course of events, would be the natural, reasonable and probable consequence of the vicious and unmerciful battery upon the body of his victim. It was likewise the right of the court to find from the evidence before it that deliberation and premeditation of an intent to kill arose during the course of the brutal affair which culminated in violent death. As stated in *State* v. *Schaffer*, 113 Ohio App., 125, at page 130:

''Case law establishes the rule that the law presumes a man to intend results which are the natural, reasonable and probable consequences of his voluntary acts, and he is not presumed to intend results which are not the natural, reasonable or

probable consequences of such act. *State* v. *Farmer*, 156 Ohio St., 214. 15 Ohio Jurisprudence (2d), Criminal Law, Section 311, and cases cited therein."

There being sufficient evidence before the trial court for it to find beyond a reasonable doubt that the accused's acts were voluntary in the legal sense, and also that the acts which caused death were perpetrated when the accused had actually formed the purpose to maliciously kill and had deliberated and premeditated upon the intent to kill before he performed the act of killing, the court did not err in entering its judgment of murder in the first degree. It is not the time of deliberation and premeditation that is requisite, but the actual existence of the malice, purpose, deliberation and premeditation, and it matters not how short the time, if the party has actually turned it over in his mind, weighed and deliberated upon it. *State* v. *Ross*, 92 Ohio App., 29, at page 43.

We find no error prejudicial to the accused in this assignment.

The remaining errors claimed are:

"4. That the verdict is against the weight of the evidence.

"5. That the appellant was denied a fair trial by reason of permitting the prosecutor to argue matters unsupported by evidence.

"6. That the verdict and judgment are contrary to law.

"7. That the court erred in failing to set aside the verdict upon appellant's motion for a new trial and to grant appellant a new trial.

"8. That other errors apparent on the face of the record occurred at the trial to the prejudice of the appellant which prevented appellant from having a fair trial."

These claims of error numbered 4 to 8, inclusive, we find untenable.

In our study of the record and the scholarly and exacting briefs before us, we conclude and so find that the many legal safeguards thrown about an accused person have been scrupulously observed, and that the appellant was accorded a fair trial before competent and experienced judges; and we are satisfied beyond a reasonable doubt, as was the trial court, that the evidence, coupled with all reasonable inferences to be drawn

thereform, proves the appellant guilty of murder in the first degree beyond a reasonable doubt.

Specifically finding no error in the record of a prejudicial nature, we must and do affirm the judgment. See, also, Section 2945.83, Revised Code.

*Judgment affirmed.*

HUNSICKER, P. J., and SKEEL, J., concur.

SKEEL, J., of the Eighth Appellate District, sitting by designation in the Ninth Appellate District.