maintained with the requisite "fair assurance." [17]

## V

For the foregoing reasons, I would reverse McCall's conviction and remand the case for a new trial.

In re J.M., Appellant.

No. 90–183.

District of Columbia Court of Appeals.

Argued Dec. 19, 1990.
Decided Sept. 6, 1991.

---

C. Edward Shacklee, appointed by the court, for appellant.

Charlotte M. Brookins, Asst. Corp. Counsel, with whom Herbert O. Reid, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellee District of Columbia.

Jay B. Stephens, U.S. Atty., and John R. Fisher and Shanlon Wu, Asst. U.S. Attys., filed a brief amicus curiae for the U.S.

Before SCHWELB and FARRELL, Associate Judges, and MACK, Senior Judge.

SCHWELB, Associate Judge:
Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.

*Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 572–73, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

# I

## THE CASE

This case concerns a collision between this nation's "war" against the pernicious drug trade and the constitutional rights of a fourteen-year-old boy who was apparently being used by unscrupulous traffickers as a courier. Following a stipulated juvenile bench trial, appellant J.M. was found guilty of possession of cocaine with intent to distribute it, in violation of D.C.Code § 33–541(a) (1988). On appeal, he contends that the trial judge committed reversible error when he denied J.M.'s pretrial motion to suppress 110 grams (roughly a quarter of a pound) of crack cocaine. The contraband was strapped to J.M.'s body and recovered by police when they boarded the bus on which J.M. was riding at the Washington, D.C. Greyhound–Trailways bus terminal at 2:30 a.m. on October 31, 1989 to interview and conduct "consent" searches of passengers in order to determine if any of them were carrying illegal drugs. A police detective eventually reached J.M., and, after interrogating him and searching his luggage, patted him down and found the cocaine.

Following an evidentiary hearing, the trial judge found that J.M. had not been seized within the meaning of the Fourth Amendment and that he had consented to the search and frisk. J.M. contended below, and now maintains on appeal that, under all of the circumstances, he was not free in any realistic sense to refuse to cooperate with the officers or to withhold his consent to the search. The issue is not an easy one, but we agree with J.M.

The procedures in this case reflect a common but controversial new tactic used by police to interdict the traffic in illegal drugs. A number of courts, as well as a three-member minority of the Supreme Court of the United States, have characterized the kind of "consent search" conducted in this case as more consistent with the practices of despotic regimes than with the institutions and traditions of a free nation. *See Florida v. Bostick*, —— U.S. ——, ——, 111 S.Ct. 2382, 2389–91, 115 L.Ed.2d 389 (U.S.) (Marshall, J., dissenting), and decisions there cited. Indeed, the Supreme Court itself has intimated that it views such police tactics as less than ideal.[1] In

---

1. "[T]his Court is not empowered to forbid law    enforcement practices simply because it consid-

*United States v. Lewis,* 287 U.S.App.D.C. 306, 312, 921 F.2d 1294, 1300 (1990), on the other hand, the court dismissed some of the concerns cited by several courts (and later adopted by the *Bostick* minority) as "rhetorical flourish" with "no basis in fact or law."

Be that as it may, the likes and dislikes of individual judges regarding particular police procedures cannot be dispositive of a constitutional issue. The Court held in *Bostick* that the activities of drug interdiction officers who board buses at scheduled stops, pose incriminating questions to passengers, and request permission to search them do not amount, *per se,* to Fourth Amendment seizures. The Court directed that each case be evaluated on the basis of the totality of the circumstances to determine whether there has been a seizure and, if not, whether the passenger has freely consented to the search. *Bostick, supra,* —— U.S. at ——, 111 S.Ct. at 2388–89; *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

Applying the "totality of the circumstances" test, informed by what we regard as the correct legal principles, to the evidentiary record in this case, we conclude that the District failed to prove that J.M. voluntarily gave his free and unconstrained consent to the search of his property and person. We reach this conclusion primarily because J.M. was only fourteen years of age at the time of the encounter, because he was not advised of his right to withhold his consent, and because the surrounding circumstances as described by the police detective who testified for the District (including the cramped space on the bus, the pressures incident to the presence of numerous other passengers, and the occurrence of the encounter at 2:30 a.m.) were such that J.M.'s choice was not free in the practical context of its exercise. Accordingly, we reverse the judgment and remand the case to the trial court with directions to grant J.M.'s pretrial motion to suppress.

ers them distasteful." *Bostick, supra,* —— U.S. at ——, 111 S.Ct. at 2389.

## II

### THE EVIDENCE

The only witnesses at the hearing on the suppression motion were Detective Donald Zattau of the Narcotics Interdiction Unit of the Metropolitan Police Department and appellant J.M. Except with respect to a single point—whether the detective asked J.M. for permission to frisk him—there was little, if any, conflict in the testimony. The dispute between the parties relates primarily to the legal consequences of uncontested facts.

Detective Zattau testified that in the early morning hours of October 31, 1989, he and a team of officers from his unit were at the Greyhound–Trailways bus station in Washington, D.C. Their assignment was to interrogate passengers arriving in or passing through Washington, D.C. from New York City and presumably to search them if there was cause or if police secured their consent. At about 2:30 a.m., a bus arrived from New York en route to various points to the south, one of which was Wilmington, North Carolina. After the driver announced a ten-minute rest stop, Zattau and two other officers,[2] who were all dressed in civilian clothes, boarded the bus.

Detective Zattau took control of the intercom without first asking the bus driver for authority to do so. He announced that he was a member of a police drug interdiction unit, and that he and his colleagues interviewed passengers arriving from New York because that city was a "source supply of drugs." He explained that other members of the unit were also on the bus at the time.

There were at least fifteen passengers on the bus; J.M. thought there were more than thirty. After questioning several passengers, Detective Zattau approached J.M., who was occupying a window seat approximately three quarters of the way to the rear. Zattau inquired where J.M. had

2. J.M. testified, however, that he was aware of only two officers who had come on board the vehicle.

boarded the bus and where he was going, and requested to see J.M.'s ticket. J.M. responded to these questions and showed the detective his ticket, which reflected a trip from New York to Wilmington. Zattau then asked J.M. whether he was carrying drugs or weapons; J.M. replied that he was not. The detective asked if he could search J.M.'s bag; J.M. agreed, but the search revealed nothing.

J.M. undoubtedly hoped, and may well have believed, that his ordeal was now over and that he would escape the encounter without the police discovering the contraband which was concealed on his person, but it was not to be. Detective Zattau testified that he next asked J.M. if he could pat him down. J.M. denied that Zattau ever made such a request, but testified that he raised his arms in response to Zattau's request that he do so. The detective felt a large, hard lump next to J.M.'s rib cage, lifted J.M.'s shirt, and discovered a clear plastic bag containing 110 grams of a rock substance which subsequently proved, upon chemical analysis, to be crack cocaine. J.M. was arrested, and the cocaine never reached Wilmington.

Detective Zattau testified that none of the passengers left the bus while the interrogations were being conducted. He indicated that if any of them had done so, this would have attracted his attention, and he would have attempted to investigate further. He stated that if J.M. had refused to answer any questions, he might have asked him the reason for his refusal, for he had been instructed that there was nothing wrong in asking why. He acknowledged that passengers had no way of knowing what would occur if they refused to permit a search, and that he made no attempt to enlighten them on the subject. On redirect examination, Detective Zattau stated that on past occasions, when a passenger had

refused his request to search a bag, this had been the end of the interview.

J.M. testified that he was fourteen years old at the time of the incident and that he had recently begun the ninth grade. No evidence was adduced that he had ever had any prior encounter with the law. J.M. stated, not surprisingly, that he became afraid when the officers boarded the bus. He felt that he could not leave the vehicle because any attempt to depart would have attracted attention to him. He stated that the passageway in the middle of the bus was very narrow, and that one of the officers was standing between J.M.'s location and the only available exit. J.M. also testified that he was afraid that the police would become suspicious if he did not agree to allow the detective to search his bag. He insisted that he raised his hands to facilitate the patdown because he felt he had no choice, and because any non-cooperation on his part would have made the police even more suspicious of him. J.M. admitted that he had told the detective that he had no drugs on his person, and that this statement was not true.

J.M. acknowledged that the detective spoke to him in a polite and conversational tone of voice and did not abuse or threaten him. There was no overt intimidation, and J.M. did not claim that the detective ever drew his weapon. A fair summary of J.M.'s testimony is that he cooperated with Detective Zattau because he apprehended that if he did not do so, the police would have regarded him as someone who had something to hide, and that this would not have been to his advantage. This, indeed, was also the prosecutor's theory, as his cross-examination of J.M. plainly revealed.[3]

The trial judge denied J.M.'s motion to suppress the cocaine. He held that the police questioning of J.M. within the close confines of the interior of the bus and the securing of J.M.'s consent to the search did

3. The cross-examination began as follows:
    Q. Mr. M., when those police officers got on the bus, you were afraid they were going to find the cocaine on you, weren't you?
    A. Yes, I was afraid.
    Q. And you wanted to attract as little attention to yourself as possible, right?
    A. Yes.
    In other words, the *prosecutor* induced J.M. to admit that the police put him in a position in which he was afraid not to cooperate with them.

not constitute a seizure within the meaning of the Fourth Amendment. He stated that there was no indication that Detective Zattau had overborne J.M.'s will. The judge credited Detective Zattau's testimony that he had requested and received J.M.'s permission before patting him down, and further found that the consent was voluntary. "Consistent with his desire to deflect suspicion from himself," the judge reasoned,

> [J.M.] turned to the officer and cooperated and raised his hands and I think hoped against hope that by golly, maybe he won't find it.... [J.M.] consented to everything that went right up and down the line.... [J.M.'s consent] was part of the pattern of his whole reaction to the situation that was in front of him.

The judge stated that he thought "the law is clear" that the detective was "not obliged, in fact, to undercut his effort by saying, oh, you don't have to answer any questions, you can walk away from me immediately, you can in fact ignore me and, indeed, I would advise you to do that."

During the course of his decision, the judge never discussed or even mentioned J.M.'s age or the lack of any evidence of any prior encounter between J.M. and the police. The judge did recognize that "in these types of encounters ... there is an inherent authority, obviously, that the officer carries with him when he is conducting this kind of an interview and asking to search a bag." He stated that he knew of no way "to get away from that or avoid it," because "[t]hat's the nature of the animal."

After the judge had denied J.M.'s motion, the parties stipulated that the testimony given at the suppression hearing would be a part of the evidentiary record of the trial. They also stipulated that the 110 grams seized constituted a usable amount of cocaine and that the evidence was consistent with possession for purposes of distribution. The judge then found J.M. guilty as charged. This appeal followed.

### III

### LEGAL DISCUSSION

*A. The nature of the issues.*

The District has not contended, either in the trial court or on appeal, that the police had probable cause to search J.M., or even articulable suspicion to detain him, prior to the discovery of cocaine on his person. Its defense of the trial court's decision must therefore stand or fall on the correctness of the judge's holding that the search and frisk, as well as the interrogation which preceded them, were consensual in character.

J.M. contests the validity of the judge's conclusion on two distinct though related grounds. First, he claims that the police interrogation and activities prior to the frisk amounted to a seizure within the meaning of the Fourth Amendment, in that under all of the circumstances a reasonable person would not have felt free to leave the bus or to decline to respond to police questions. Since the cocaine seized following the frisk was a fruit of what J.M. claims to have been an illegal seizure, he maintains that it ought to have been suppressed.

J.M. also contends that, even assuming that there was no initial seizure, the District failed to prove that the search and frisk which followed the initial interrogation were consensual. In support of that contention, J.M. cites his youth, the failure of the police to advise him that he had the right to withhold consent, and what he contends was the intrinsically coercive situation created by the police's initiation of the encounter in the cramped quarters of a bus in the middle of the night and in the presence of numerous passengers to whom any lack of cooperation on J.M.'s part would have been obvious and would have appeared suspicious as well. J.M. maintains that any freedom that he may theoretically have had to withhold his consent to the search was illusory in the context of the realities which confronted him.

Although the issues of seizure and consent may in some cases be entirely distinct, they are difficult to differentiate on the present record. The Supreme Court has traditionally held that a seizure occurs when a reasonable person would believe that he or she is not "free to leave." *See, e.g., Michigan v. Chesternut*, 486 U.S. 567,

573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *cf. California v. Hodari D.,* — U.S. ——, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991) (free "to disregard the police and go about his business"). As the Court pointed out in *Bostick,* however, the question whether the defendant in that case had been seized turned not so much on whether a reasonable person would have felt free to leave the bus (that freedom having been curtailed in any event, without police participation, by the vehicle's imminent scheduled departure) as on whether such a person "would [have felt] free to decline the officers' requests or otherwise terminate the encounter." *Bostick, supra,* — U.S. at ——, 111 S.Ct. at 2387. Although some differences arguably remain,[4] the question of seizure as refined in *Bostick* virtually merges into the issue whether the search of J.M.'s property and person was a consensual one. The freedom to ignore the police requests and the freedom not to consent to a search are surely very similar, if not absolutely identical. At the very least, as other courts have recognized, there is a substantial "overlap" between the two inquiries. *United States v. Caballero,* 290 U.S.App.D.C. 235, 240, 936 F.2d 1292, 1297 (1991).[5]

Given this overlap or near-merger, we focus our inquiry on what we believe to be the definitive issue contested by the parties, namely, whether the search of J.M., in the context of the police activity during the entire encounter, was genuinely consensual and passed muster under the "consent search" exception to the Fourth Amendment's warrant requirement. Because we answer that question in the negative, we need not decide whether a Fourth Amendment seizure occurred prior to the frisk.

## B. The scope of review.

The foregoing discussion complicates in some measure a requisite threshold determination as to the proper standard of review. There is a paradoxical aspect to our inquiry in this regard because, on the surface, it appears that we should apply different measures of deference to the trial judge's resolution of issues which, in the present context, are all but identical.

■ This court has recently stated that it reviews "de novo" the question whether there has been a seizure. *Guadalupe v. United States,* 585 A.2d 1348, 1352 n. 7 (D.C.1991). The voluntariness of a consent to a search, on the other hand, has been characterized as "a question of fact," *Schneckloth, supra,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59, and the trial judge's findings with respect thereto will be set aside only if clearly erroneous. *Kelly v. United States,* 580 A.2d 1282, 1288 (D.C.1990). Such characterizations, however, oversimplify the issue; both seizure and consent present mixed questions of fact and law. Although an appellate court is arguably in as good a position as the trial judge to decide whether a hypothetical reasonable person would feel free to ignore the police and go about his or her business under a given set of circumstances—the basic inquiry in determining whether there has been a seizure—the nature of those circumstances must be determined by the trier of fact. *Guadalupe, supra,* 585 A.2d at 1352 n. 7; *see also United States v. Mendenhall,* 446 U.S. 544, 551–52 n. 5, 100 S.Ct. 1870, 1875–76 n. 5, 64 L.Ed.2d 497 (1980). With respect to the issue of consent, on the other hand, the trial judge is plainly in the best position to assess the critical facts, including those relating to the respondent's state of mind and his understanding or lack thereof of the choices available to him. A question such as whether *Schneckloth* principles apply to a fourteen-year-old mi-

---

**4.** The seizure inquiry focuses on whether a hypothetical "reasonable person," rather than the particular defendant, would feel free to ignore the police presence and go about his business, *Bostick, supra,* — U.S. at ——, 111 S.Ct. at 2387, whereas consent analysis focuses on "both the characteristics of the accused and the details of the interrogation." *Schneckloth, supra,* 412 U.S. at 226, 93 S.Ct. at 2047.

**5.** "Because the trial court expressly determined no coercion was used to detain Caballero, it necessarily reached the same conclusion regarding those factors as they relate to the voluntariness *vel non* of his consent to search...." *Id.* 936 F.2d at 1297.

nor who has not been apprised of his right not to consent to a search, however, is necessarily one of law, and not subject to the "clearly erroneous" rule. *Cf. United States v. Lewis, supra,* 287 U.S.App.D.C. at 313, 921 F.2d at 1301 (reviewing *de novo* the trial court's finding that consent to search was involuntary, because that finding was based on what the appellate court viewed as the trial court's flawed legal analysis).[6]

In the present case, it would be altogether incongruous for this court to define the standard of review by affixing a label to the inquiry—either "seizure" or "consent"—and deferring or not deferring to the trial court on the basis of such semantic devices. Whatever nomenclature we affix to the outside of the jar, the widgets on the inside are essentially the same. Accordingly, we will focus on the substance of our task rather than on descriptive titles, and defer to the trial judge's evidentiary findings and assessment of credibility. We also recognize that the judge had the opportunity to assess the intangible atmospherics of the poignant scenario that unfolded before him and to observe flesh and blood human beings, while we have access only to a transcript which, unlike this quasi-Brobdingnagian[7] opinion, is somewhat cryptic given the dimensions of the constitutional issues at stake. We treat as predominantly a question of law, however, the key inquiry on which we think this case depends, namely, the effect of the detective's failure to advise J.M. of his right to refuse to consent to a search, under cir-

cumstances such as those here presented, when J.M. was only fourteen years old.

### C. Consent searches.

■ The Fourth Amendment proscribes unreasonable searches and seizures, and further provides that no warrants shall issue but upon probable cause. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted); *Davis v. United States,* 532 A.2d 656, 658 (D.C.1987) (per curiam). One of these specifically established exceptions is a search conducted pursuant to consent. *Schneckloth, supra,* 412 U.S. at 219, 93 S.Ct. at 2043; *Kelly, supra,* 580 A.2d at 1288; *Davis, supra,* 532 A.2d at 658.

It may be helpful to place the consent search exception in some historical perspective. In the absence of any claim by the District that the police had probable cause to believe, or an articulable basis to suspect, that he was engaged in unlawful conduct, J.M. had a constitutional right to be left alone and, specifically, not to be searched or frisked without his consent. Accordingly, an intuitive inquiry is whether J.M. knowingly and intentionally waived his Fourth Amendment rights. In *Johnson v. United States,* 333 U.S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948), the Supreme Court appeared to approach the question in this way, reasoning that consent to the

---

**6.** When the Supreme Court described "voluntariness" as a question of fact to be determined from all the circumstances, *Schneckloth, supra,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59, it was addressing the case of an adult. No issue regarding a minor was before the Court. The law treats children differently from adults. See pages 970–973, *infra.* A threshold determination of law must therefore be made here as to whether and in what measure the Court's analysis applies to fourteen-year-old juveniles. As the Court cautioned in *Armour & Co. v. Wantock,* 323 U.S. 126, 132–33, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944),

> [i]t is timely again to remind counsel that words of our opinions are to be read in the

light of the facts of the case under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading.

Accordingly, we are not persuaded by the catechism in footnote 1 of our colleague's dissenting opinion or by other related observations to the same effect.

**7.** For those readers who were not weaned on Jonathan Swift's satire, Brobdingnag was the land of giants to which Lemuel Gulliver travelled; its inhabitants, like this opinion, were not short. *See* J. SWIFT, GULLIVER'S TRAVELS (1726).

entry of the police into Johnson's bedroom "was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right." Earlier, in *Amos v. United States*, 255 U.S. 313, 317, 41 S.Ct. 266, 268, 65 L.Ed. 654 (1921), the Court had held that the defendant's wife did not "waive his constitutional rights" by admitting government agents who demanded without a warrant to search his home. The classic definition of a waiver of a constitutional protection is "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

Under this standard, J.M. could not be deemed to have relinquished his Fourth Amendment rights in the absence of a showing that he knew of them. This is not necessarily unreasonable for, as the Supreme Court observed in *Escobedo v. Illinois*, 378 U.S. 478, 490, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 (1964), history teaches us that "no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights."

In its definitive decision in *Schneckloth*, however, the Supreme Court declined to apply to "consent" searches the waiver analysis of *Johnson v. Zerbst* and similar authorities. The Court held instead that the decisive question is whether the defendant's consent was voluntary, i.e., free from any official duress or coercion, express or implied. 412 U.S. at 227, 93 S.Ct. at 2047. Alluding to pre-*Miranda*[8] juris-

prudence which had addressed the admissibility of confessions, the Court identified the proper inquiry as being whether the defendant's consent was "the product of an essentially free and unconstrained choice by its maker." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. at 2047 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)). The Court reiterated that "when a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Id.* at 222, 93 S.Ct. at 2045 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968)).[9]

Bustamonte had contended, and the Court of Appeals for the Ninth Circuit had held, that it is an essential part of the State's initial burden to prove that a person knows that he has a right to refuse consent. *Bustamonte v. Schneckloth*, 448 F.2d 699, 700–01 (9th Cir.1971). The Supreme Court, however, rejected this contention, explaining instead that

the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.

412 U.S. at 227, 93 S.Ct. at 2047–48.[10] Faced with the argument that its "failure

---

8. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

9. "[S]uch a waiver or consent must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied." *Judd v. United States*, 89 U.S.App.D.C. 64, 66, 190 F.2d 649, 651 (1951) (citing *Amos, supra*). Although the Supreme Court appears to have departed in *Schneckloth* from "waiver" analysis for consent searches, the requirement of "clear and positive" evidence presumably remains intact.

10. The Court stated that the "totality of all the surrounding circumstances" included "both the characteristics of the accused and the details of

the interrogation." *Id.* at 226, 93 S.Ct. at 2047. It explained that the

factors taken into account have included the youth of the accused; his lack of education ... or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.... While state of the accused's mind, and the failure of the police to advise the accused of his rights, [are] certainly factors to be evaluated in assessing the "voluntariness" of an accused's responses, they [are] not in and of themselves determinative.

to require the Government to establish knowledge as a prerequisite to a valid consent, will relegate the Fourth Amendment to the special province of the sophisticated, the knowledgeable and the privileged," *id.* at 247–48, 93 S.Ct. at 2058 (internal quotation marks omitted), the Court responded as follows:

> We cannot agree. The traditional definition of voluntariness we accept today has always taken into account evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights; and the voluntariness of any statement taken under those conditions has been carefully scrutinized to determine whether it was in fact voluntarily given.

*Id.* at 248, 93 S.Ct. at 2058 (footnote omitted). Quoting from Justice White's dissenting opinion in *Escobedo, supra,* 378 U.S. at 499, 84 S.Ct. at 1769, the Court added that "[w]hen the accused has not been informed of his rights at all the Court characteristically and properly looks very closely at the surrounding circumstances." *Id.* at 248 n. 37, 93 S.Ct. at 2059 n. 37. *See also Davis, supra,* 532 A.2d at 659.

Although, after *Schneckloth,*[11] the failure of the police to advise a defendant of his right to refuse consent is but one of several factors to be considered, it remains a very significant one. Such an omission "will sometimes invalidate a consent search because such a warning was necessary to counteract other coercive elements." 3 W. LaFave, Search and Seizure: A Treatise on THE FOURTH AMENDMENT § 8.2(i), at 213 (2d ed. 1987). In holding in *Mendenhall, supra,* 446 U.S. at 558–59, 100 S.Ct. at 1879, that a valid consent had been given to an airport search the Court stated:

> First, we note that the respondent, who was 22 years old and had an 11th-grade education, was plainly capable of a knowing consent. Second, it is especially significant that the respondent was twice expressly told that she was free to decline to consent to the search, and only thereafter explicitly consented to it. Although the Constitution does not require "proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search," [*Schneckloth, supra,* 412 U.S.] at 234 [93 S.Ct. at 2051] (footnote omitted), such knowledge was highly relevant to the determination that there had been consent. And, perhaps more important for present purposes, the fact that the officers themselves informed the respondent that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive.

The converse of the last sentence is equally compelling—the detective's failure in this case to advise an individual who was much younger than Ms. Mendenhall, and who had substantially less education, that he had the right to refuse to consent, substantially *increased* the probability that the police conduct could reasonably have appeared to him to be coercive.[12] *See also*

---

*Id.* at 226–27, 93 S.Ct. at 2047 (citations and footnote omitted).

**11.** In *State v. Johnson,* 68 N.J. 349, 346 A.2d 66 (1975), the Supreme Court of New Jersey, in interpreting the Constitution of that State, declined to follow the Supreme Court's reasoning in *Schneckloth.* Observing that each state has the power to impose higher standards on searches and seizures under state law than is required under the Federal Constitution, *id.* at 351, 346 A.2d at 67, the court said:

> Many persons, perhaps most, would view the request of a police officer to make a search as having the force of law. Unless it is shown by the State that the person involved knew that he had the right to refuse to accede to such a request, his assenting to the search is not meaningful. One cannot be held to have waived a right if he was unaware of its existence.

*Id.* at 354, 346 A.2d at 68. Since the District has no Constitution, however, and since this court has no authority to second-guess the Supreme Court with respect to the proper construction of the Fourth Amendment, the issue presented in *Johnson* does not arise.

**12.** Some courts have suggested that a request to a citizen for his or her consent carries with it by implication notice that the citizen's consent is significant. *See, e.g., State v. Price,* 55 Haw. 442, 443–44, 521 P.2d 376, 377 (1974). Professor LaFave has criticized this reasoning, 3 LaFave, *supra,* § 8.2(i), at 212, and we think the quoted language from *Mendenhall* effectively rejects it.

*Bostick, supra,* —— U.S. at ——, 111 S.Ct. at 2385, in which the Supreme Court, in its discussion of the question whether Bostick had been seized, found it "particularly worth noting" that "the police specifically advised Bostick that he had the right to refuse consent."

Professor LaFave has written that "[e]xplicit police warnings of Fourth Amendment rights are significant even when given to the knowledgeable person, for they show the individual that the police are prepared to recognize his choice to assert his constitutional rights." 3 LaFave, *supra,* § 8.2(i), at 214 & n. 206 (internal quotation marks omitted). But if such a message is appropriate even for the sophisticated suspect, the problem is more acute for an uneducated person than, say, for a physician. *See Davis, supra,* 532 A.2d at 659.

In the present case, the individual whom the police failed to advise of his right to refuse to consent to the search was not shown to be a doctor or university graduate, or even a street-smart veteran of numerous confrontations with the police. Although the quarter of a pound of cocaine concealed on his person may suggest that he was no angelic young innocent, J.M. was fourteen years old, and had completed only the eighth grade, at the time of his unwelcome encounter with Detective Zattau.

### D. The significance of J.M.'s youth.

In determining whether J.M.'s consent to the search and frisk was valid, we find it instructive to consider the treatment which the law accords to other important decisions made by a boy of fourteen. To be sure, we live in an era when many youngsters of J.M.'s age differ from their counterparts of a generation ago. Some of them fire UZI automatic weapons rather than playing stickball. *See, e.g., In re L.J.,* 546 A.2d 429 (D.C.1988). Nevertheless, if J.M. had agreed, without any pressure of any kind having been placed on him, to buy something from Detective Zattau, he could not have been compelled to honor his agreement. "The law renders an infant's

contracts unenforceable to protect infants from improvident bargains and injustice." *Hurwitz v. Barr,* 193 A.2d 360 (D.C.1963).[13] As the court stated in *Bonner v. Moran,* 75 U.S.App.D.C. 156, 157, 126 F.2d 121, 122 (1941),

> [i]n deference to common experience, there is general recognition of the fact that many persons by reason of their youth are incapable of intelligent decision, as the result of which public policy demands legal protection of their personal as well as their property rights. The universal law, therefore, is that a minor cannot be held liable on his personal contracts or contracts for the disposition of his property.

■ Minority is in itself a badge of incompetency to handle one's own affairs. *Hampton v. Ewert,* 22 F.2d 81, 86 (8th Cir.1927), *cert. denied,* 276 U.S. 623, 48 S.Ct. 303, 72 L.Ed. 737 (1928); *Dixon v. United States,* 197 F.Supp. 798, 803 (W.D.S.C.1961). "In the absence of bad faith the doctrine of waiver does not apply to an infant, nor can he [or she] consent to the violation of his [or her] rights...." *Dixon, supra,* 197 F.Supp. at 803 (quoting 31 Corpus Juris 1008).

A decision to consent to a police search has consequences for a juvenile at least as grave as those facing the purchaser of a motor scooter. Nevertheless, the cited authorities, derived from other areas of the law, have not resulted in the adoption of a doctrine that a minor has no capacity to admit to an offense. When the police, during custodial interrogation, properly advise a juvenile in conformity with *Miranda,* for example, a voluntary statement made thereafter is admissible in evidence, provided that the court finds, after considering the juvenile's age, experience, education, background and intelligence, that he or she "has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). Moreover, this

---

13. The court added that the law "seeks to restore the infant to his position prior to contract-

ing." *Id.* The contract in *Hurwitz* was for the purchase of a motor scooter.

court has declined to embrace a *per se* doctrine holding invalid any statement of a juvenile which was made in the absence of a parent or counsel, because such a rule would "sacrific[e], in many cases ..., the vital interests underlying the policies and goals of the juvenile court system." *In re J.F.T.*, 320 A.2d 322, 324 (D.C.1974).

But even where *Miranda* warnings have been given, great care must be taken to ensure that a juvenile's statement is voluntary. *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967); *In re W.B.W.*, 397 A.2d 143, 145 (D.C.1979). Juveniles are not simply treated as smaller adults. As a four-Justice plurality of the Supreme Court stated in *Haley v. Ohio*, 332 U.S. 596, 599, 601, 68 S.Ct. 302, 303–04, 92 L.Ed. 224 (1948), in setting aside the conviction of a fifteen-year-old boy who had confessed to murder during prolonged custodial interrogation,

> [w]hat transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces.

> \* \* \* \* \* \*

> But we are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them.

In *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), a boy of fourteen—the same age as J.M.—confessed to his part in a robbery and homicide while in police custody for five days. There was no prolonged interrogation, but the boy had no contact with his mother or with counsel. In holding that his confession was improperly obtained, the Court stated that "a 14–year–old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police." *Id.* at 54, 82 S.Ct. at 1212. The Court went on to express the view that young Gallegos

> cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself.

> \* \* \* \* \* \*

> Without some adult protection against this inequality, a 14–year–old boy would not be able to know, let alone assert, such constitutional rights as he had. To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights.

*Id.* at 54–55, 82 S.Ct. at 1212–13. *Accord, In re Gault, supra,* 387 U.S. at 45–54, 87 S.Ct. at 1453–58; *see also Taylor v. United States,* 380 A.2d 989, 992 n. 6 (D.C.1977) (a juvenile defendant's age "is one of the factors which should weigh heavily in a consideration of the circumstances" of a confession); *cf. In re T.T.T.,* 365 A.2d 366, 369 (D.C.1976) (juvenile's familiarity or lack thereof with the criminal justice system is accorded weight in determining voluntariness of confession).

"Persons dealing with infants must take notice of their privileges and disabilities." *Dixon, supra,* 197 F.Supp. at 803. This obligation applies with equal force to the

police; "[t]he need for special treatment begins at the instant the juvenile is contacted by peace officers...." *State v. Shaw,* 93 Ariz. 40, 47, 378 P.2d 487, 491 (1963) (en banc). As the Supreme Court of Arizona recently remarked in *State v. Carrillo,* 156 Ariz. 125, 136, 750 P.2d 883, 894 (1988) (en banc), the police "are not permitted to take advantage of the impoverished, the mentally deficient, the young, or the inexperienced by employing artifices or techniques that destroy the will of the weakest but leave the strong, the tough, and the experienced untouched." The court went on to explain that

> the propriety of the investigative and interrogation techniques used must be judged in light of what the police knew or should have known about defendant's ability to comprehend the events and circumstances surrounding him or her. The police cannot treat an uneducated, retarded suspect in the same manner as they might treat a sophisticated businessman or professional suspected of white collar crime.

*Id.* at 137, 750 P.2d at 895. *Carrillo* concerned the voluntariness of a confession but, as Professor LaFave has written following a discussion of that opinion, "[t]he same conclusion is appropriate regarding police efforts to obtain consent to conduct a search." 3 LaFave, *supra,* § 8.2, at 32 (1991 Supp.).

If a confession by a juvenile following a *Miranda* warning is subject to rigorous scrutiny, then this must surely be even more true of a consent to a search which was given without any explanation of rights. Under these circumstances, it has been suggested by a distinguished IJA–ABA Commission which was chaired by Judge Irving R. Kaufman and which included Justice Tom Clark, retired, that

> an appropriate constitutional standard for juveniles is [arguably] that they cannot give a voluntary consent unless they are informed of their right to refuse consent. This suggests that the test rejected by the Court in *Schneckloth* should be

adopted for juveniles, given the greater likelihood of their lack of sophistication and their greater susceptibility to apparent or real coercion. In other words, this may be an example of an area where, because of greater vulnerability, due process may require greater rights for juveniles than for adults.

Institute of Judicial Administration & American Bar Association, Joint Commission on Juvenile Justice Standards, *Police Handling of Juvenile Problems* § 3.2(a), at 67 (1980). The IJA–ABA Standards were approved by the ABA's House of Delegates.[14] In its landmark decision on the rights of juveniles, the Supreme Court described as "authoritative," and gave respectful consideration to, "standards" adopted by comparable organizations. *In re Gault, supra,* 387 U.S. at 49, 56–57 & n. 98, 87 S.Ct. at 1455, 1458–59 & n. 98.

Children in our society are supposed to obey adults. Habitually disobedient juveniles can, in effect, be prosecuted as children in need of supervision, and restrictions may be placed upon their liberty. D.C.Code §§ 16–2301(8), 16–2320(c)–(d) (1989). Stubborn juveniles may constitutionally be punished for refusing to submit to the lawful commands of adults with responsibility over them. *See, e.g., Commonwealth v. Brasher,* 359 Mass. 550, 551–59, 270 N.E.2d 389, 391–95 (1971). Since police officers, as the trial judge noted, carry with them an intrinsic air of authority, and since even adults rarely feel that they can refuse to answer a police officer's question and simply walk away, *see generally Lawrence v. United States,* 566 A.2d 57, 60–61 & n. 7 (D.C.1989) and authorities there cited, a fourteen-year-old boy confronted by police officers cannot ordinarily be expected to "know" that he is free to disregard a police "request" to search him or her, especially when the encounter occurs at 2:30 a.m. on a crowded bus in a strange town far from home and family. In light of these realities, the views expressed by the IJA–ABA Commission tend to ring true in the world as it

**14.** *See also* Note, *Preadjudicatory Confessions and Consent Searches: Placing the Juvenile on* *the Same Constitutional Footing as an Adult,* 57 B.U.L.Rev. 778, 788–91 (1977).

really exists (as opposed to an imaginary society in which everyone who boards a bus, no matter how young or uneducated, is a budding constitutional lawyer). The directive that courts be "earthy" about encounters between citizens and officers, *see Cooper v. United States,* 368 A.2d 554, 557 (D.C.1977), should be a two-edged sword, which may be invoked by a citizen attempting to vindicate constitutional rights as well as by the constable seeking to restrict the citizen's liberty. *See Lawrence, supra,* 566 A.2d at 63.

Nevertheless, we are not prepared to hold that a consent by a juvenile to a search is invalid in all cases unless he or she has been advised of the right to refuse consent. Advice of rights is unnecessary if the prosecution can prove that the consenting individual is aware of them. *Johnson, supra,* 68 N.J. at 353, 346 A.2d at 68. Moreover, *Schneckloth* commands us to consider all of the circumstances, and does not encourage the adoption of ironclad rules based on only some of the relevant facts. To use considerable license in paraphrasing George Orwell, however, not all circumstances are equal, and some circumstances are more equal than others.[15] In *Schneckloth, supra,* 412 U.S. at 226, 93 S.Ct. at 2047, and *Mendenhall, supra,* 446 U.S. at 558–59, 100 S.Ct. at 1879–80, the Supreme Court placed considerable emphasis both on the defendant's age, education and experience, *see also Haley, supra,* 332 U.S. at 598–601, 68 S.Ct. at 303–05, and *Gallegos, supra,* 370 U.S. at 52–54, 82 S.Ct. at 1211–13, and on whether or not he or she has been advised of the right not to con-

sent. *Accord, Bostick, supra,* —— U.S. at ——, 111 S.Ct. at 2383–85. That approach is consistent with the court's traditional protection of children from over-reaching by adults in a wide variety of situations. Accordingly, we hold that where a juvenile, especially one as young as J.M., has not been advised of his rights, the burden on the prosecutor to establish that consent to a search was a voluntary one is a heavy one, which cannot be sustained by showing only that no weapons were displayed and that no threats were made. In the absence of proof that a juvenile of that age had sufficiently extensive prior experience with the law or the police to compensate, in the real world, for the greater maturity and worldly wisdom of an adult, we think that a purported consent to search under circumstances comparable to those presented by this record should ordinarily be invalidated.

### E. The totality of the circumstances.

Applying these principles to the record before us, we have a fourteen-year-old boy with but eight years of schooling and, so far as the record discloses, no prior contact with the law. He was confronted by the police at 2:30 a.m. and never advised that he had the right to refuse his consent to the search of his person and property. The encounter occurred within "the cramped confines of a bus," a fact which the Supreme Court has identified as "one relevant factor that should be considered in evaluating whether a passenger's consent is voluntary." *Bostick, supra,* —— U.S. at ——, 111 S.Ct. at 2389. Moreover, the search was an intrusive one which extended not

---

15. "All animals are equal, but some animals are more equal than others." G. Orwell, Animal Farm (1945). *Schneckloth*'s voluntariness test has been severely criticized, not only because it permits defendants to give up constitutional rights without knowing of their existence, *see Schneckloth,* 412 U.S. at 277, 93 S.Ct. at 2073 (Brennan, J., dissenting), *id.* at 284–89, 93 S.Ct. at 2076–79 (Marshall, J., dissenting), but also on account of its perceived vagueness. *See, e.g.,* 3 LaFave, *supra,* § 8.2, at 175. As one writer has observed,

> the concept of voluntariness is no more definite than the concept of consent. We lack a firm principle for deciding in varying circumstances whether ignorance of a highly rele-

vant fact deprives consent of voluntariness. The product of *Schneckloth* is likely to be still another series of fourth amendment cases in which the courts provide a lengthy factual description followed by a conclusion (most likely, in the current climate, that consent was voluntarily given), without anything to connect the two.

Weinreb, *Generalities of the Fourth Amendment,* 42 U.Chi.L.Rev. 47, 57 (1974) (*quoted in* 3 LaFave, *supra,* § 8.2, at 175). To prevent the "totality of the circumstances" principle from becoming as amorphous as the foregoing passage suggests, courts must develop some rational method of according some circumstances greater weight than others.

only to J.M.'s private belongings, but also to items located on his person and under his shirt.[16]

To be sure, there was no overt intimidation by the police. Detective Zattau did not draw his weapon, although J.M. testified that he was aware that his interrogator was armed. J.M. was not in custody when the encounter began.[17] The Supreme Court reiterated in *Bostick, supra,* —— U.S. at ——, 111 S.Ct. at 2387, that "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." If he was familiar with the precedents on which this portion of *Bostick* was based, a reasonable passenger could be confident, at least in theory, that refusal would not lead to his arrest or detention.[18]

But immediate arrest was not the only adverse consequence that could reasonably be anticipated. A passenger who declined to do as the police asked could quite rationally apprehend that this would not be the end of it. In a case arising from a similar incident at the same bus station on November 16, 1989, about two and a half weeks after J.M.'s encounter with Detective Zattau,

> Detective Hairston testified that if a passenger refuses to permit a search of his

or her bags or claims not to have identification, he "might be suspicious" and, depending on the conversation with the passenger, would notify authorities at the next stop that he suspected the passenger of carrying drugs.

Thus, denying a police officer's request to search could result in further scrutiny and questioning at every stop. Any reasonable person would feel less than free to refuse a police search if aware that refusal to cooperate could lead to repeated harassment. As the hour became late, police in every city down the line could board the bus and wake the uncooperative passenger.

*United States v. Cothran,* 729 F.Supp. 153, 156 (D.D.C.1990) (Gesell, J.), *rev'd sub nom. United States v. Lewis, supra.* It is true that neither J.M. nor any other passenger would know what the detective would be likely to do if a passenger declined to consent to a search, because Detective Zattau did not tell them and left the point to the passenger's imagination.[19] It is surely a trifle unrealistic, however, to require a citizen confronted by the police to operate on the assumption that a police officer would be more accepting of recalcitrant behavior than the officer later testified that

---

**16.** The search was conducted in the presence of anywhere from fifteen to more than thirty passengers. If J.M. had declined to consent, he would have faced the prospect of travelling to Wilmington through the night in the company of numerous persons, most of whom were probably adults, and none of whom had declined to submit to a search. He could reasonably apprehend that some of these people would suspect him of drug activity and perhaps might not appreciate him on that account. Even if—and it is a big if—J.M. could expect the police to do nothing if he refused his consent, the police action could generate frightening private pressures against him.

**17.** There were doubtless significant psychological inhibitions, however, against any attempt on J.M.'s part to depart or to refuse his cooperation. *See Lawrence, supra,* 566 A.2d at 60–61, and discussion at pages 972–973, *supra.*

**18.** Even this point is not as clear as it might be. In *Hodari D., supra,* 111 S.Ct. at 1549 n. 1, the Supreme Court, speaking through Justice Scalia made the following observation:

> That it would be unreasonable to stop, for brief inquiry, young men who scatter in panic upon the mere sighting of the police is not self-evident, and arguably contradicts proverbial common sense. See Proverbs 28:1 ("The wicked flee when no man pursueth.")

In response, the dissenters, speaking through Justice Stevens, quoted *Alberty v. United States,* 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051 (1896):

> Nor is it true as an accepted axiom of criminal law that "the wicked flee when no man pursueth, but the righteous are as bold as a lion."

*Hodari D., supra,* 111 S.Ct. at 1553 n. 4. Whatever the merits of the doctrine of *stare decisis* as it applies to the jurisprudential significance, if any, of biblical quotations, the fact is that in the present case, Detective Zattau would have investigated further if any of the passengers had left the bus.

**19.** The case would, of course, be quite different if J.M. had been advised that he had a right to refuse and that no reprisal of any kind would be taken against him.

he would really be.[20]

Suffice it to say that most reasonable people would believe that the police have considerable power and that it is best not to defy or make enemies of officers. "When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men [and women]." *Edwards v. Habib*, 130 U.S.App.D.C. 126, 140, 397 F.2d 687, 701 (1968), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969). We would surely be closing our eyes to reality if we were to conclude that a boy of J.M.'s age and background is legally bound to assume, without having received any explanation of his rights, or of the consequences of declining to do what the police wanted him to do, that nothing would happen if he withheld his consent. Assuming, *dubitante*, that any reasonable person could expect an act of defiance to bring him no unfavorable consequences, we do not think that the District proved, convincingly or indeed at all, that J.M. gave his free and unconstrained consent to the police to search and frisk him.

We recognize that the judge made what he may have viewed as a factual finding that J.M. consented to the search. As we have noted, however, the principal issue dividing the prosecution and the defense, namely, the effect of J.M.'s age and of the failure of the police to advise him of his right to withhold consent, is primarily one of law which the judge did not, at least explicitly, consider or decide. In any event, even if we were to take a more deferential approach, a trial court finding cannot stand if it was induced by erroneous application of the law, *United States v. Singer Mfg. Co.*, 374 U.S. 174, 194–95 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963), or if

the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Under these circumstances, we are constrained to reverse the judgment of the trial court.

## IV

## CONCLUSION

The Fourth Amendment protects us against unreasonable searches and seizures. Its guarantees are to be "liberally construed to prevent impairment of the protection extended." *Grau v. United States*, 287 U.S. 124, 128, 53 S.Ct. 38, 40, 77 L.Ed. 212 (1932). "It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886). The Fifteenth Amendment "nullifies sophisticated as well as simple-minded modes of discrimination," *Lane v. Wilson*, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939), and the Fourth Amendment merits an equally generous construction.

The Supreme Court held in *Bostick* that the particular interdiction device which the police utilized in this case is not unconstitutional *per se*, and we are bound to accept, and to follow fairly rather than grudgingly, its clear (but quite narrow) decision. The Court recognized, however, that "if [the war on drugs] is to be fought, those who fight it must respect the rights of individuals, whether or not those individuals are suspected of having committed a crime." *Bostick, supra*, —— U.S. at ——, 111 S.Ct. at 2389.

---

**20.** In *Lewis, supra*, 921 F.2d at 1299–1300, Judge Buckley wrote for the court that "[a]lthough Detective Hairston testified that he might report an uncooperative passenger to authorities at the next bus stop, he did not inform Cothran of that possibility.... There is no evidence here that the passengers believed that if they refused to cooperate, the officers might alert police at a subsequent stop of their 'suspicious' behavior." Aside from the anomaly of requiring "reasonable" passengers to assume that the officers

would exert less pressure on them than they actually would, the evidence is important for another reason. An intention on the part of the police to use coercive tactics in response to a passenger's exercise of his or her rights, even if uncommunicated to the passenger, is relevant to the state of mind of the officers, and puts everything they did into perspective. What a detective contemplates doing later can shed a good deal of light on how he probably proceeded earlier.

Under our Constitution, a citizen may not be arrested without probable cause or detained absent articulable suspicion. If the police are permitted, even in seeking to suppress the pernicious drug trade, to circumvent these requirements by exerting subtle but virtually irresistible pressure on citizens, especially the young, untutored and poor among them, until they "consent" to intrusive searches which would otherwise be impermissible, then the protections of our Constitution will be significantly undermined.

The price of the drug plague has already been tragically high. Cocaine, heroin, PCP and the rest have taken a dreadful toll. Countless lives have been taken or ruined by these poisons. Many young men and women languish in overcrowded prisons because of the insidious lure of these substances and the profits that can be derived from their illicit distribution. The residents of our cities, including this majestic capital, walk in fear of drug-related violence. But if our courts allow the liberty of the citizen to be eroded in the name of fighting drugs, then the loss of these precious rights is likely to be irreversible. The surrender of constitutional freedoms would be the most poignant and the most tragic of all of the casualties of crack cocaine and of the other substances of like ilk. This is the import of Justice Brandeis' insightful warning in the prologue.

For the foregoing reasons, the adjudication of delinquency is reversed, and the case is remanded to the trial court with directions to grant J.M.'s motion to suppress tangible evidence.

*So ordered.*

FARRELL, Associate Judge, dissenting.

I regret I cannot join the majority's decision directing suppression of the narcotics seized from appellant. To do so, I would have to be able to conclude either (1) that the trial judge, though having heard J.M.'s explanation of the events and viewed his demeanor, clearly erred in finding as a fact that he freely consented to the search, or (2) that, as a matter of law, the consent was involuntary because *presumptively*

every consent by a juvenile to a search is coerced unless (a) he has been advised of his right to refuse consent or (b) the government can show that he has had "extensive experience with the law or the police." I cannot reach the first conclusion on this record; and, more importantly, I cannot join the majority in superimposing a presumption—the nearest thing to a *per se* rule of involuntariness—on a determination which the Supreme Court has said is factual and individual, and hence entrusted to the trier of fact in the first instance. I therefore respectfully dissent.

### I.

J.M., a month and a half shy of fifteen at the time, was arrested en route to Wilmington, North Carolina from New York carrying a quarter pound of crack cocaine taped to his body. At the suppression hearing, the trial judge heard Detective Zattau explain how he approached J.M. and, in a conversational voice, ask J.M.'s point of origin and destination and to see his ticket; next ask if the youth had heard his previous remarks over the speaker system and whether he was carrying drugs or weapons; and finally, after J.M. allowed a search of his bag, ask whether he would allow a frisk of his person, to which the youth responded by turning towards the detective and raising his arms. The judge then heard appellant testify, over some twenty transcript pages, that he had consented to the search of his bag because he knew it contained nothing illegal and feared drawing suspicion to himself by refusing, but that he refused consent to the pat-down of his person, after which Zattau "just started patting me down" anyway. Having heard all of this testimony, and fully aware of J.M.'s age and education, the judge found that Detective Zattau's behavior had not been calculated to overbear appellant's will, and that J.M. had consented to the pat-down and done so voluntarily. "[C]onsistent with his desire to deflect suspicion from himself," the judge reasoned, J.M.

> turned to the officer and cooperated and raised his hands and I think hoped that

by golly, maybe he won't find it.... [J.M.] consented to everything that went right up and down the line.... [J.M.'s consent] was part of the pattern of his whole reaction to the situation that was in front of him.

## II.

The majority "recognize[s] that the judge made what he may have viewed as a factual finding that J.M. consented to the search." *Ante* at 975. It also purports to recognize, in keeping with the trial judge's "view," that the voluntariness of a consent to search is "a question of fact," *ante* at 966 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973)),[1] and that "the trial judge's findings with respect thereto will be set aside only if clearly erroneous." *Id.* (citing *Kelly v. United States*, 580 A.2d 1282, 1288 (D.C.1990)). *See also Childress v. United States*, 381 A.2d 614, 616 (D.C.1977) ("we are bound to uphold the trial court's finding that a search was consensual unless such a finding is clearly erroneous"). Finally, the majority "recognize[s] that the judge had the opportunity to assess the intangible atmospherics of the poignant scenario that unfolded before him and to observe flesh and blood human beings, while we have access only to a transcript...." *Ante* at 967. Nevertheless, the majority concludes that all of this is essentially beside the point, because though it will "defer to the trial judge's evidentiary findings and assessment of credibility," *id.*, it holds that "the key inquiry on which we think this case depends, namely, the effect of the detective's failure to advise J.M. of his right to refuse to consent to a search," is "predominantly *a question of law*," at least "under circumstances such as those here presented, when J.M. was only fourteen years old." *Id.* at 967 (emphasis added). *See also id.* at 975

("the principal issue ..., the effect of J.M.'s age and of the failure of the police to advise him of his right to withhold consent, is primarily one of law"). In other words, the facts (a) that J.M. was not told he was free to refuse consent and (b) that he was only fourteen are henceforth removed from the totality of *facts* the judge considers in deciding the issue of consent and endowed with "predominantly" *legal* significance. They in fact dictate a legal overlay which the majority imposes on every determination of consent by a juvenile, at least one of "tender years."

> [W]e hold that where a juvenile, especially one as young as J.M., has not been advised of his rights, the burden on the prosecutor to establish that consent to a search was a voluntary one is a heavy one, which cannot be sustained by showing only that no weapons were displayed and that no threats were made. In the absence of proof that a juvenile of that age had sufficiently extensive prior experience with the law or the police to compensate, in the real world, for the greater maturity and worldly wisdom of an adult, we think that a purported consent to search under circumstances comparable to those presented by this record should ordinarily be invalidated.

*Ante* at 973.

I do not disagree that, even as to an adult, the government's burden of proving consent is a heavy one in the sense that the trial judge must resolve all ambiguities in the record against finding consent. *Schneckloth*, 412 U.S. at 222, 229, 93 S.Ct. at 2045, 2048 (consent must be given "the most careful scrutiny"); *Judd v. United States*, 89 U.S.App.D.C. 64, 66, 190 F.2d 649, 651 (1951) (consent must be shown by "clear and positive testimony"). Nor do I dispute the obvious point that consent cannot be shown merely by the fact "that no weapons were displayed and ... no threats

1. To be accurate, the majority says that "[t]he voluntariness of a consent to search ... *has been characterized* as 'a question of fact,'" citing *Schneckloth*, as though the Supreme Court's "characterization" of this constitutional issue is no different than that of any other court or commentator. The Supreme Court's repeated statement that "[v]oluntariness is a question of fact to be determined from all the circumstances," 412 U.S. at 248–49, 93 S.Ct. at 2059; *id.* at 227, 93 S.Ct. at 2047, is a holding this court may not distance itself from by reformulating it as a "characterization."

were made." *Schneckloth* makes clear that the consent inquiry must consider "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation," 412 U.S. at 226–27, 93 S.Ct. at 2047–48; and *among* these are "the youth of the accused," his "lack of education," and "the lack of any advice ... of his constitutional rights." *Id.* I disagree with the majority fundamentally, however, when it extracts these latter factors—J.M.'s youth and the lack of advice to him that he could refuse consent—from the total complex of facts the judge considers in finding consent *vel non*, and elevates them to legal determinants that henceforth should "ordinarily ... invalidate[ ]" consent unless the government can show some ill-defined prior experience with the law or police on the juvenile's part.[2]

Though the majority insists to the contrary, I consider its analysis intolerably close to "the adoption of iron-clad rules based on only some of the relevant facts," *ante* at 973, a concern the majority dismisses because in its view "some circumstances are more equal than others." After *Schneckloth* and *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), I believe it is error for this court to isolate one or more factors from the totality of facts before the judge in any consent determination and hold that presumptively ("ordinarily") the presence or absence of these factors, as a matter of law, yields the correct result.[3] Under the majority's formula, despite *Schneckloth*, the failure to advise J.M. of his right to refuse consent trumps all other factors the judge properly considered such as the length of the contact and questioning, J.M.'s explanation of

his behavior and what that said about his relative maturity, *and* the absence of any threats or overbearing conduct by the police.[4] The majority does not hold that the judge failed to consider the two factors it singles out. Rather, its dissatisfaction is with *Schneckloth*'s "totality of the circumstances" test which it considers impossibly "amorphous" unless courts "develop some rational methods of according some circumstances greater weight than others." *Ante* at 973 n. 15. The majority thus undertakes, in effect, to reform the Supreme Court's consent analysis.

Nothing in *Schneckloth* implies that trial judges should mechanically assign facts and circumstances equal weight in evaluating consent. But neither does *Schneckloth* (nor *Bostick* ) in my view justify an appellate court's segregating out factors such as age and non-advice of rights and holding, as a matter of law, that these will invalidate consent unless a specific countervailing factor—prior experience with the law or police—is also present. I cannot join in this absolutization of factors which, with the best intention of providing a "firm principle" for analysis, *ante* at 973 n. 15, subjects an intensely factual weighing of circumstances to presumptive rules that may foreordain an unjust result.

To be sure, the majority highlights the fact that J.M. was not merely a juvenile but a youngster of fourteen, implying that the combination of youth and lack of advice of rights may be less decisive as the age of the person whose consent is sought increases. But the majority's lengthy discussion, *ante* at 970–973, of how society and the law treat "juveniles," imposing an

---

**2.** Nor can I find in the majority's reasoning a limiting principle that explains why other disabilities besides youth—such as mental retardation and apparent lack of education, to name just two—will not similarly be reviewed by this court henceforth as "predominantly legal" factors in their bearing on consent. *See ante* at 972 (citing and applying to the consent analysis *State v. Carillo,* 156 Ariz. 125, 136, 750 P.2d 883, 894 (1988)).

**3.** *See, e.g., Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047 ("The significant fact about all of these decisions [on voluntariness] is that none of

them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances"); *Bostick,* 111 S.Ct. at 2386–87 (rejecting *"per se* rule" that "cramped confines of bus" invalidates consent; "a court must consider all the circumstances surrounding the encounter").

**4.** Although the majority notes that "the judge never discussed or even mentioned J.M.'s age," *ante* at 965, it wisely attaches no legal significance to that fact in view of the judge's obvious familiarity with *Schneckloth* and the decisions cited to him applying its consent standards.

equal obligation on officials to "take notice of their ... disabilities," *ante* at 971 (citation omitted), provides no guidance as to when the presumption that rules the consent inquiry is lifted as age increases. Our Youth Rehabilitation Act, for example, generally renders eligible for "youth offender" treatment a person less than 22 years old, D.C.Code § 24–801(6) (1989). Also, to paraphrase the majority, it is apparent to any reader of the newspapers that some 14–year–olds are "more 14 than others." In any case, no matter how closely the juvenile defendant approaches majority, the trial court henceforth will know that its assessment of two factors bearing on consent—the effect of youth and non-advice of rights—will be reviewed differently than all others by the appellate court, *i.e.*, "primarily [as issues] of law," *ante* at 975. This thumb on the judicial scale will thus remain to influence, and even determine, an inquiry which the Supreme Court has emphasized should consider all of the circumstances and lead to a factual finding by the body best situated to make it.

Here the trial judge heard J.M. testify at length barely six weeks after the events at issue. After observing the youth's explanation of the events and demeanor, and crediting Detective Zattau's description of the questioning, the judge found that "the pattern of [J.M.'s] whole reaction" to the questioning was not submission to authority but an attempt "to deflect suspicion from himself" in hopes of avoiding detection. The majority finds it nearly impossible to accept that a boy of J.M.'s years could consent out of calculation, however ill-founded, rather than intimidation and ignorance of his rights. In part this may reflect a belief that no one, adult or child, carrying drugs on his person would freely consent to a pat-down. But that proposi-

tion has been rejected by the Supreme Court. *Bostick*, 111 S.Ct. at 2388 ("the 'reasonable person' test presupposes an *innocent* person" (emphasis by Court)).[5] It also may reflect dissatisfaction with *Schneckloth*'s rejection of the "knowing and intelligent waiver" test for Fourth Amendment consents. *See ante* at 973 n. 15.

At all events, the majority goes on to describe the pressures one in J.M.'s position "could have" felt to consent involuntarily, including the "frightening private pressures" police action "could generate" in the form of ostracization by fellow passengers if he (unlike they) did not cooperate. *Ante* at 974. It is not apparent, first, how these pressures would have been any different had J.M. been advised of his right to withhold consent. Moreover, underlying the majority's description of the "adverse consequences" J.M. could anticipate from refusing to consent lies an apparent skepticism about the possibility of consent in these police-citizen encounters, involving adults *or* juveniles, that makes its adoption of special rules for juvenile consent inevitable, but correspondingly flawed. We are told, for example, that "most reasonable people would believe that the police have considerable power and that it is best not to defy or make enemies of officers," *ante* at 975; and so it is doubtful that "any reasonable person could expect an act of defiance [*i.e.*, a refusal to consent] to bring him no unfavorable consequences," *id.* Translated into practice, of course, these assertions would cast grave doubt on the legitimacy of our decision in *Kelly v. United States, supra,* and the large number of decisions upholding consent on which it relied.[6] The possibility that refusal to consent will itself generate police "suspicion" does not alter the fact, as the Supreme Court has repeatedly stated, that "a refus-

---

5. *See also McNeil v. Wisconsin,* — U.S. —, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991) ("[S]uspects often believe that they can avoid the laying of charges by demonstrating an assurance of innocence through frank and unassisted answers to questions").

6. For example, *United States v. Nurse,* 286 U.S.App.D.C. 303, 305–08, 916 F.2d 20, 22–25 (1990); *United States v. Smith,* 284 U.S.App.D.C.

64, 65–66, 901 F.2d 1116, 1117–18, *cert. denied,* — U.S. —, 111 S.Ct. 172, 112 L.Ed.2d 136 (1990); *United States v. Joseph,* 282 U.S.App. D.C. 102, 105–06, 892 F.2d 118, 121–22 (1989); *United States v. Baskin,* 280 U.S.App.D.C. 366, 369–70, 886 F.2d 383, 386–87 (1989), *cert. denied,* — U.S. —, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990).

al to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Bostick,* 111 S.Ct. at 2387. I do not share the majority's perception that "reality" may be otherwise or at least that a reasonable person—particularly a juvenile—will apprehend it is so.

Having said this, I nonetheless agree with the trial judge's recognition that "in these types of encounters ... there is an inherent authority ... that the officer carries with him" in asking permission to search. Consequently, in circumstances where the individual has not been told he is free to refuse consent, and where in addition he is as young as J.M., the Supreme Court's teaching applies full force that "the voluntariness of any statement taken under those conditions [must be] carefully scrutinized to determine whether it was in fact voluntarily given." *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2058. But unlike the majority, as I have explained, I do not believe *Schneckloth* allows this court to isolate these or any individual circumstances and hold that by themselves, as a matter of law, they ordinarily must determine the consent issue. Because that is the essence of the majority's holding, and because I also do not believe the trial judge's finding that J.M.'s consent was voluntary is without support in the evidence, D.C.Code § 17–305 (1989), I respectfully dissent from the reversal of the trial court's judgment.